464 P.2d 793

**STATE of Arizona, Appellee,**

v.

**Patrick Daniel MALONEY, Appellant.**

**No. 1923.**

Supreme Court of Arizona,
In Banc.

Jan. 27, 1970.

Rehearing Denied March 3, 1970.

**350**

Gary K. Nelson, Atty. Gen., by Carl Waag, and Leonard M. Bell, Asst. Attys. Gen., Phoenix, for appellee.

Marshall W. Haislip, Phoenix, for appellant.

LAURANCE T. WREN, Superior Court Judge.

This is an appeal from a conviction and sentence of death mandated by a jury's verdict on each of two counts of an information charging defendant with murder in the first degree of his mother and stepfather. At the time of the homicides defendant was just under 16 years of age.

At a former trial on the same charges, he had been found guilty of murder in the second degree as to the stepfather, and in the first degree as to the mother. Punishment was fixed on the former to a term of years in the state prison, with life imprisonment being assessed on the latter. These convictions were subsequently reversed by this Court on the ground of denial of due process of law under the Fourteenth Amendment to the United States Constitution.

At the trial below, the State contended that defendant had, prior to killing his parents, decided to leave home with another boy, and a girl with whom he planned marriage; and that he also intended to steal his stepfather's car and money. Defendant admitted his prior intention to leave and get married, but denied any preconceived plan to commit a theft.

Defendant, on the witness chair, recounted to the jury the following events: That on the evening in question he had advised his mother of his intention to leave immediately; that she had then asked him to delay his departure until such time as her husband might be away from their apartment, as she wanted him to have "another act of sexual intercourse" with her before he left; that later in the evening his mother came into his bedroom to inform him that the stepfather had gone; that he thereupon went into her bedroom and took off his clothes; that his mother also undressed, except for a negligee, and then procured from a dresser drawer a condom for him to use; that they had just finished having intercourse when the stepfather returned and saw them together in bed; that he, the defendant, then walked out of the bedroom and into the living room where his stepfather was standing, and that the latter appeared so distraught he could not speak; that he then continued on into the kitchen when he heard a scream from his mother.

The court and jury were further told that he thereupon grabbed a butcher knife and returned to the living room. He then entered a small hallway where he was confronted by his stepfather who was brandishing a pistol.

He testified further that a fight ensued, and that his mother ran in to help him. The stepfather then, either deliberately or accidentally, shot the mother. Further, that if she had any stab wounds on her body they undoubtedly were inflicted accidentally while he was fighting so violently with the other decedent.

The next morning, when the bodies were discovered in the apartment, a "used" condom wrapped in a piece of kleenex, and an empty, metal, condom box were found by the investigating officers in decedents' bedroom and tossed into a wastebasket.

Defendant's main contention on this appeal is that the discard of the condom, kleenex, and box constituted a suppression of material evidence which otherwise would have substantiated his claim of self-defense. He urges that a scientific examination of such evidence would have materially supported his assertion that he and his mother had in fact engaged in an act of sexual intercourse on that evening.

He further urges (1) the unconstitutionality of the death penalty, (2) violation of the Double Jeopardy Clause of the

Fifth Amendment to the Federal Constitution, by virtue of the first degree murder conviction under each count at the second trial, (3) error in giving or refusing certain instructions, and (4) misconduct by the county attorney in his closing arguments to the jury.

Approaching these assertions in the order of their magnitude urged by defendant, we render the following decision:

## SUPPRESSION OF EVIDENCE

■ We are here faced with the question of whether the discard of relevant, physical evidence found by police officers at the scene of a crime constitutes a suppression of evidence in denial of due process. Defendant contends he was thereby deprived of a scientific analysis for possible fingerprints, blood, semen and/or pubic hairs that would have corroborated his defense, and that the failure to preserve and examine this evidence assumes constitutional dimensions by a denial of fundamental fairness.

We cannot agree. When applied to the facts of this case the term "suppression of evidence" is a misnomer. According to the record the officers were acting in good faith when the condom, kleenex, and box were thrown away. They could not then have known that defendant was to later claim that his stepfather had discovered him and his mother in an act of sexual intercourse. Nor could they have known, and there was nothing to put them on notice at the time, that such evidence might tend to exonerate the accused. Certainly the destruction thereof was not the result of guile.

The fact that the items were found, and the time and place of their discovery, were testified to at the trial. The nonproduction of the items themselves does not constitute a "suppression of evidence," even if they had still been in existence. The probative effect of any laboratory examination of such items for circumstantial evidence would, obviously, have to be mere speculation. Defendant's arguments to the contrary are not convincing.

It would be comfortable if a comprehensive formula could be devised to determine when the fairness of a trial is violated by withholding or destroying evidence which is, or may be, exculpatory. An examination of the authorities, however, dictates the obvious observation that courts must look to the circumstances of the particular case in reaching a decision.

■ It is now, though, an established proposition that disclosure of evidence favorable to an accused is not restricted to "discovery" rights, and that there exists a broad duty on the part of the prosecution to reveal such evidence to the accused. State v. Fowler, 101 Ariz. 561, 422 P.2d 125 (1967); United States ex rel. Meers v. Wilkins, 326 F.2d 135 (2d Cir. 1964). The Ninth Circuit in Thomas v. United States, 343 F.2d 49 (9th Cir. 1965), for example, citing the landmark case of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), invoked the "well-recognized rule * * * that a conviction cannot stand where a prosecutor has, either wilfully or negligently, withheld material evidence favorable to the defendant."

The obvious reason for the rule was adeptly noted by Justice Bernstein in the Fowler case:

> "Both prosecutors and the police, as public officers acting on behalf of the state, are sworn to uphold the law and are duty bound to protect the rights of the innocent as well as to prosecute the guilty. Their primary duty is not to convict, but to see that justice is done. Canon 5, Canons of Professional Ethics. A prosecutor who fails to reveal evidence that clearly would aid the accused's defense would seem to have lost sight of his proper objective. * * *" State v. Fowler, 422 P.2d 125 at 127.

As was said in Curran v. State of Delaware, 259 F.2d 707 (3rd Cir. 1958), the trial of a capital case, or indeed any other trial, no longer can be considered properly a game of wits and skill, in which the State's function is to outwit and entrap its

quarry. But certainly such principles must be measured in terms of essential fairness of the procedures used, and not in the astuteness or foresightedness of the investigating officers. They must know, or have reason to know, that the evidence being destroyed was either material or favorable to the accused.

If the argument here advanced by defendant were to prove successful, would we not hereafter be requiring all investigating officers, at their peril, to bring the entire crime scene, "lock, stock, and barrel," including the ceiling, floor, and walls, into court? What if the accused here were to claim that in running from his attacker he had placed his hand on a window? Would the conviction then have to be overturned because an officer had, without knowledge of his claim, destroyed possible fingerprints by allowing a maid to wash the window in question? The principle urged could well lead to deliberate fabrication on the part of an accused after learning what items officers had discarded or failed to preserve.

Had the police retained the items in question, run appropriate tests, the results of which substantiated defendant's contentions, and then concealed both the evidence and analysis thereof from his scrutiny, he would be placing himself within the purview of the authorities on suppression of evidence. On the other hand, had the officers suppressed evidence of the "finding" of the prophylactic, or given false testimony in regard thereto, the Due Process Clause would require redress. The fact that defendant here may have been harmed by the failure to preserve this evidence is not enough. An erroneous admission of evidence by a trial court or a bad interpretation of a state law, without more, would not raise a constitutional issue, although both errors might harm the defendant.

■ It is true that an accused does not have access to all the evidence, much of which has usually been removed or obliterated by the time he learns that he is to be tried for the crime. He cannot, therefore, as the State does, sift out what appears helpful to his defense. And clearly the State is not to decide for the court what is admissible, or, for the defense, what is useful. Griffin v. United States, 87 U.S. App.D.C. 172, 183 F.2d 990 (1950).

State v. Counterman, 8 Ariz.App. 526, 448 P.2d 96 (1969) is in point here. The defendant there asserted that he was deprived of a fair trial because the State had failed to offer in evidence a brassiere worn by the deceased when she was shot. He contended that the brassiere was significant evidence tending to show that the gun discharged during the course of a struggle. The Court disagreed, holding that the principle announced in Fowler was not applicable, in that the existence of the State's custody of the brassiere in question was clearly made known to the defendant and his counsel during defense counsel's cross examination of the investigating officer. The record there reflects a discourse between defense counsel and the witness very analogous to the matter here:

"Q. Now, did you, aside from the evidence which you have indicated that you took into custody, did you take any other evidence into custody?

A. Yes, sir.

Q. What was that?

A. One white woman's brassiere

Q. Whom did that belong to?

A. To the victim.

Q. You say the victim, you mean Mrs. Bachman?

A. Yes, sir.

Q. Did that have any marks on it?

A. Yes, sir, it had.

Q. What marks were they?

A. It had powder tattooing, and I believe a small amount of blood."

At the first trial of the cause here the examination went as follows: (Mr. Haislip to Officer Copeland)

"Q. I will ask you if you found anything else on the floor of the northeast bedroom?

A. As far as evidence * * *

Q. Sir? I will ask you if you found a piece of kleenex on the floor?

A. Yes, I did.

Q. And what position on the floor was the piece of kleenex?

A. South of the head of the bed in the northeast bedroom.

Q. Was there anything wrapped up in the kleenex?

A. Yes, there was.

Q. What was wrapped in it?

A. It appeared to be a used cundrum (sic).

Q. Where is that cundrum (sic).

A. I left it at the scene. We didn't feel that it was necessary.

Q. You left that at the scene?

A. Yes.

Q. You didn't feel that was necessary?

A. No.

Q. I will ask you if you found anything else in the northeast bedroom?

A. I don't remember.

Q. Did you find an empty cundrum (sic) box on the head of the bed in the northeast bedroom?

A. Yes, I guess there was."

The same defense counsel conducted a similar cross-examination before the second trial jury on the evidence found in the northeast bedroom:

"Q. Did you find anything on the floor?

A. Yes.

Q. What did you find, Mr. McMillan?

A. I found a kleenex.

Q. And did you find anything else?

A. Yes.

Q. What did you find?

A. There was a contraceptive in the kleenex.

Q. Was the kleenex wrapped—was the contraceptive wrapped in the kleenex?

A. Yes, it was.

Q. What kind of a contraceptive did you find wrapped in the kleenex?

A. I don't know enough about them to know what kind they are.

Q. Well, of what material was it?

A. It was a latex plastic.

Q. In other words what is commonly referred to as a rubber, wasn't it?

A. Yes.

Q. And you examined it?

A. Very briefly.

Q. And it appeared to have been recently used?

A. Yes.

Q. What gave it the appearance of having been used?

A. The substance inside of it.

Q. A secretion that appeared to be from human body?

A. Yes.

Q. What did you do with the contraceptive?

A. Threw it in the wastepaper basket.

Q. Did you personally throw it in the wastepaper basket?

A. Yes.

Q. In other words, it didn't make it to the laboratory, did it?

A. There was no test to be performed on it.

Q. Sir?

A. There would be no reason to have a test performed on it."

Common sense cannot dictate a limitation on the prosecutor's duty as to exculpatory evidence. In many cases it is impossible to tell, in advance of trial, what evidence tends to prove innocence and what does not. Most evidence is inherently neutral. A used bullet proves no one guilty unless the prosecution provides the necessary links between the defendant, the bullet and the victim. Similarly, the bullet proves no one innocent until the defense lawyer can show that there was no connection. Certainly it is logical that the officers here assumed

the discarded evidence to be of such a nature; more readily an integral part of the "bedroom scene" of a married couple than a material part of the "homicide scene."

## PRODUCTION OF EVIDENCE

As a corollary to the argument on suppression of evidence, error is urged in the giving of an instruction to the effect that the State was not required to produce as exhibits all available evidence. Defendant ostensibly contends that the instruction erroneously precluded the jury from considering that the conspicuous absence of vital corroborative evidence, such as the condom, created suspicion that such evidence, if offered in court, would have been favorable to the defense. Such argument relies on the presumption, in some instances, as to the adverse nature of evidence not produced.

At stated heretofore, the introduction of the missing items would have contributed nothing. Had they still been in existence at the time of trial the State would have been under no obligation to offer them as evidence. And the instruction still would have been proper.

> "There is no compulsion on the prosecution to call any particular witness or to make any particular tests so long as there is fairly presented to the court the material evidence bearing upon the charge for which the defendant is on trial." People v. Chapin, 145 Cal.App. 2d 740, 303 P.2d 365 (1965); People v. Tuthill, 31 Cal.2d 92, 187 P.2d 16 (1947).

The instruction was designed to avoid the exact, false inference of nonproduction which defendant here asserts. No such inference by the jury is proper under these facts, and the instruction is correct, as in this case, where was no apparent relevancy at the time of the investigation of the condom to the offenses of murder.

## EQUAL PROTECTION AND THE DEATH PENALTY

Was defendant denied equal protection of the laws when he received the ultimate penalty? It appears to be his contention that he was discriminated against because his crimes were made punishable by death. He argues that execution of the death penalty would deny him further pursuit of appellate remedies to question the validity of his convictions, in violation of the equal protection guarantee of the Fourteenth Amendment.

Such argument is totally without merit. It is settled law that any *one* penalty does not abridge the rights of a person under the Equal Protection Clause so long as no *one* person is subject to any different or greater punishment than others of the same class. People v. Turville, 51 Cal.2d 620, 335 P.2d 678 (1959); certiorari denied, 360 U.S. 939, 79 S.Ct. 1465, 3 L.Ed. 2d 1551. Equal protection of the laws here means only that the death penalty may be applied to all persons in the State in a like position. And, in Arizona, all persons charged with murder in the first degree face possible imposition of the extreme penalty. Equality of treatment does not destroy individualization of sentencing to fit the crime and the individual. Persons convicted of the same crime can constitutionally be given different sentences. Jung v. State, 32 Wis.2d 541, 145 N.W.2d 684 (1966).

## INSTRUCTIONS

Defendant urges eight other instances of trial court error by its refusal to give certain proffered instructions dealing with various phases of self-defense and reasonable doubt.

This Court has carefully examined each of them and finds some perilously near to comments on the evidence, and that, insofar as they are correct expositions of the law, the substance of each was adequately and correctly encompassed in the general instructions. Since the instructions given embodied the contents of the rejected instructions, the Court did not err in refusing to charge the jury as requested by the defendant. State v. Michael, 103 Ariz. 46, 436 P.2d 595 (1968).

## CLOSING ARGUMENTS

The defendant next claims that the prosecutors' arguments to the jury constitute reversible error by virtue of their inflammatory nature. Defendant, however, voiced no objection to the trial bench at the time the comments complained of were made.

First, it is a well-settled principle of law that it is the duty of counsel, and not the trial court, to voice objections to arguments of counsel that are objectionable, and that failure to do so constitutes a waiver of any right of review. State v. Stout, 5 Ariz.App. 271, 425 P.2d 582 (1967); State v. White, 102 Ariz. 162, 426 P.2d 796 (1967). The only exception to this rule would be when such comments result in an obvious miscarriage of justice. State v. Smith, 101 Ariz. 407, 420 P.2d 278 (1966).

Secondly, we have examined the record of closing arguments and find nothing that would have prejudiced the jury in its verdict. Clearly they were based on the evidence adduced at the trial, and inferences legitimately to be derived therefrom, and on matters of general notoriety and common knowledge.

## DOUBLE JEOPARDY

Did the retrial on charges of murder in the first degree with the infliction of the death penalty on each count violate the Double Jeopardy Clause of the Federal Constitution? We answer in the affirmative as to Count I and in the negative as to Count II.

Can the defendant, who had been charged with two counts of first degree murder and found guilty by jury verdicts of first degree with life imprisonment on Count II, and second degree on Count I, and whose convictions were reversed on appeal, be retried on the original charges of first degree murder? We answer in the affirmative as to Count II and in the negative as to Count I.

Arizona has heretofore aligned itself with the position, albeit a minority one, that due process is not violated by the retrial of a defendant who had been charged with first degree murder and found guilty of second degree murder, and whose conviction was reversed on appeal, being retried on the original charge of first degree murder. Double jeopardy did not attach on the retrial of the greater crime after defendant had successfully appealed a conviction of a lesser included offense. The plea of former jeopardy could not be urged until there had been a conviction or acquittal free from legal error. 17 A.R.S. Rules of Criminal Procedure, Rule 314; State v. White, 103 Ariz. 85, 436 P.2d 904 (1968); State v. McClendon, 103 Ariz. 105, 437 P.2d 421 (1968); and State v. Thomas, 88 Ariz. 269, 356 P.2d 20 (1960).[1]

However the question of double jeopardy in this area has now assumed constitutional dimensions on the Federal level under the Fifth Amendment to the Constitution of the United States; the applicable portion of which we herein quote:

"* * * nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb * * *."

Article 2, § 10, of the Constitution of the State of Arizona, A.R.S., reads as follows:

"No person shall be compelled in any criminal case to give evidence against himself, or be twice put in jeopardy for the same offense."

Rule 314, Rules of Criminal Procedure, A.R.S. Vol. 17, 1956, provides:

"When a new trial is granted, the new trial shall proceed in all respects as if no former trial had been had. On the new trial the defendant may be convicted of any offense charged in the indictment or information regardless of the verdict

---

1. Many of the state courts which have considered the problem have concluded that under circumstances similar to those of this case a defendant cannot be tried a second time for first degree murder. In general see the annotations at 59 A.L.R. 1160, 22 L.R.A.,N.S. 959, and 5 L.R.A., N.S. 571.

or finding on the former trial. The former verdict or finding shall not be used or referred to in evidence or argument on the new trial."

In upholding the constitutionality of Rule 314, this Court held in Thomas, supra, that where a defendant had been charged with murder in the first degree and convicted of manslaughter, and subsequently the conviction was reversed on appeal and a new trial ordered, the second trial under the same information charging defendant with first degree murder did not place him twice in jeopardy for the same offense in violation of either the Federal or State Constitutions. See also State v. McClendon, supra.

In 1937 the United States Supreme Court decided the landmark case of Palko v. Connecticut, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937). Palko, although indicted for first degree murder, had been convicted of murder in the second degree after a jury trial in a Connecticut State court. The State appealed and won a new trial. Palko argued that the Fourteenth Amendment incorporated, as against the states, the Fifth Amendment's restriction on multiple trial or punishment. The Supreme Court, however, held that Federal double jeopardy standards were not applicable as against the states, and that such procedure "passed" due process requirements if there was no violation of "fundamental principles of liberty and justice." In subsequent appeals from state courts the High Court continued to apply the Palko doctrine. See, e. g., Brock v. North Carolina, 344 U.S. 424, 73 S.Ct. 349, 97 L.Ed. 456 (1953). Note also our discussion of Palko in Thomas.

The principle that an accused should not be subject to the hazards of trial and possible conviction more than once for the same offense is deeply rooted in Anglo-American law. In this country, as noted above, it is presently embodied in the Fifth Amendment to the Federal Constitution and in the constitution or law of every state in the Union. The underlying idea, often stated, is that the State, with all its resources and power, should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal, and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

The constitutional philosophy enunciated in Palko was, however, expressly repudiated in the recent case of Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed. 2d 707 (1969), with the following language:

"* * * we today find that the double jeopardy prohibition of the Fifth Amendment represents a fundamental ideal in our constitutional heritage, and that it should apply to the states through the Fourteenth Amendment. Insofar as it is inconsistent with this holding, Palko v. Connecticut is overruled."

Palko has thus become another casualty in the march toward "incorporating" much, if not all, of the Federal Bill of Rights into the Due Process Clause.

To ascertain then the Federal standards of double jeopardy in a like situation we need look no further than Green v. United States, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed. 2d 199 (1957), cited with approval in Benton. There the Court held that a new trial in Federal District Court on first degree murder would violate the Fifth Amendment, after defendant had successfully appealed his conviction of second degree murder.

The facts in Green present a completely analogous situation. Defendant had been tried in the District of Columbia under an indictment charging arson in the first count and murder in the first degree in the second. On the latter count the trial judge instructed the jury on both first and second degree murder. A verdict was returned which found defendant guilty as charged on Count I and of second degree murder on Count II. The jury was silent as to the charge of first degree murder. Defendant successfully appealed his con-

viction of second degree murder, and, on remand, was tried again for first degree murder under the original indictment. At the outset of the second trial, he raised the defense of former jeopardy, but the court overruled his plea. The jury then found him guilty of first degree murder and he was sentenced to death.

On certiorari the United States Supreme Court reversed, holding defendant's conviction of first degree murder at the second trial placed him in jeopardy twice for the same offense in violation of the Fifth Amendment. The decision rested on the ground that the jury verdict was an implicit acquittal of the charge of first degree murder and that his successful appeal was not to be held a waiver of his defense of former jeopardy to a second prosecution on such charge. The Court made it clear that Green's jeopardy for first degree murder came to an end when the jury was discharged at the first trial.

The Court thus struck down this Tribunal's previous rulings expressed in Thomas and McClendon that, in order to secure reversal of an erroneous conviction for one offense, a defendant must surrender his valid defense of former jeopardy, not only on that offense but also on a different offense for which he was originally charged and not convicted, and which was not involved in his appeal. Or, stated in terms of this case, he must be willing to barter his constitutional protection against a second prosecution for an offense punishable by death as the price of a successful appeal from an erroneous conviction of another offense for which he has been sentenced to a term of years in the state prison.

It was noted in Green that the situation could be treated no differently "for purposes of former jeopardy, than if the jury had returned a verdict which expressly read: 'We find the defendant not guilty of murder in the first degree, but guilty of murder in the second degree.'"

The law in Arizona has therefore been changed by judicial fiat of the High Court.

Henceforth the prosecution cannot allege error as depriving the accused of the benefit of an acquittal by a jury. The conviction of murder in the first degree on Count I of the Information must therefore be reversed.

The prosecution for first degree murder under the same Information as to Count II, however, clearly was not proscribed by constitutional law. Placing defendant's guilt or innocence thereof a second time before a jury speaks directly to the same axiom discussed above and did not place him twice in jeopardy. No acquittal was involved here. Nor can there be any hurdle in the path of the death penalty being decreed where the jury had previously fixed life imprisonment. The principle is sacrosanct that punishment would have to be affixed anew by the same jury determining guilt. A.R.S. § 13–453, State v. Boggs, 103 Ariz. 328, 441 P. 2d 778 (1968). Also see Stroud v. United States, 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103 (1919).

To look next to the question of prejudice by the prosecution of an invalid count jointly with another whose validity is otherwise upheld we find the doctrine of "tainted" evidence inapplicable to this case.

It is obvious from the face of the record that defendant's conviction on Count II was in no way affected by his simultaneous trial for first degree murder on Count I. The evidence adduced at the trial was all plainly relevant to the charge of murdering his mother and the verdict rendered thereon. So intertwined are the circumstances of the two charges that any separation of the proofs as to either would be impossible.

Defendant's "acquittal" of first degree murder as to the stepfather at this first trial and the conviction of first degree murder on the same count at the second trial cannot be taken as having necessarily determined any particular question of fact against the validity of the conviction on the other count.

## RETROSPECTIVE OR PROSPECTIVE APPLICATION

 The question of whether Benton must be given retroactive application has not been settled by the Supreme Court of the United States. We will, therefore, determine the matter here by examining the guidelines, which that Court has already enunciated, to ascertain prospective or retrospective meaning, as the same were outlined in our previous decision of Application of Billie, 103 Ariz. 16, 436 P.2d 130 (1968). (For a significant analysis of retroactivity of constitutional decisions, see also 41 Notre Dame Lawyer 206 (1965–66)).

In Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966) the Court formulated the criteria for determining the scope of a new rule's application, and stated that retroactive application will be justified when the rule affects " * * * 'the very integrity of the fact-finding process' and averted 'the clear danger of convicting the innocent.' "

Under the test laid down by Johnson, and followed in Billie, it was noted that "Each constitutional rule of criminal procedure has its own distinct functions, its own background of precedent, and its own impact on the administration of justice, and the way in which these factors combine must inevitably vary with the dictate involved. Accordingly * * * we must determine retroactively 'in each case' by looking to the peculiar traits of the specific 'rule in question.' "

Retroactive application here would seriously disrupt the administration of our criminal laws. It would require the retrial or release of numerous prisoners found guilty by trustworthy evidence, in conformity with previously announced constitutional standards on double jeopardy. However, a ruling which is *purely prospective* in nature does not even apply to the parties before the Court.

We do not here find that the "integrity" of the fact-finding process is affected in any way, and that a clear danger of convicting the innocent would be averted by retrospection. Prior to Benton the law in Arizona clearly permitted the procedural practice employed here by the prosecution, a practice which this Court had theretofore announced and expressly condoned.

We therefore hold that this newly announced principle of double jeopardy, because of the exigencies of the situation, be not given retroactive application, except as to those cases on direct appeal on the date this decision is rendered. The doctrine shall not apply to cases finalized prior thereto.

## MODIFICATION OF SENTENCE

The judgment of death by lethal gas has called upon us to carefully and painstakingly search the record to determine whether there is serious error. We find none as to the conviction and sentence on Count II.

 We feel compelled, however, because defendant was only 15 years of age at the time he killed, to also carefully examine the propriety of the ultimate penalty here, particularly in view of the fact that at his first trial the jury did not decree his execution.

The status of capital punishment in our society today is in turmoil. A debate on its efficacy in modern penal law is raging throughout the country. Whether or not the death penalty is a deterrent, many people oppose its use because of its effect on the administration of criminal justice. Patterns of reversal, retrial and procrastination mark the course of appellate review on any death verdict. The processes thereof become protracted, and errors in procedure appear much more glaring to the reviewing court. And, when a life is at stake, emotionalism often infects the conduct of the trial itself. There is also a tremendous disparity between the broad extent to which the penalty is possible and the relative infrequency with which it is imposed or carried out. Many states, including Arizona, with the death sentence on their books, have not had an execution

---

in years.[2] Less than a hundred and fifty years ago England had over two hundred offenses punishable by death. Today the death penalty there has been abolished, as it has in many states of the Union. Throughout the world the death penalty has been put on trial metaphorically and the trend is toward abolition.

The question of its constitutionality under the Eighth Amendment's protection against "cruel and inhuman treatment" is presently before the United States Supreme Court.[3] Historically it has been the law that "cruelty" is to be defined, not in terms of the excesses existing when the term was inserted within the Bill of Rights, but rather in terms of the contemporaneous standards and usage of society. But, merely to assert that death is the ultimate cruelty and, therefore, must be unconstitutional, is to recite a tautology. We must, however, take a realistic look at our death rows here in Arizona and elsewhere across America.

As early as 1910 the United States Supreme Court declared in Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910):

"Legislation * * * should not, therefore, be necessarily confined to the form that evil had theretofore taken. Time works changes, brings into existence new conditions and purposes. Therefore a principle, to be vital, must be capable of wider application than the mischief which gave it birth."

This dynamic view received expressed ratification in 1958 in Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630, when the Court said:

"* * * the words of the [Eighth] Amendment are not precise, and * * * their scope is not static. The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society. * * The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards."

There is no way to define rigidly the cases in which the proper sentence should be executed. Judges and juries are given the power to decide without legal guidelines. This unquestionably incorporates endless differences, depending on the individuals involved, the jury that is chosen, the attitude of the press and public, and other incidents of time and place.

There is thus a plethora of arguments pro and con on the question. We will not here summarize them because they were too well known. As announced by the California Supreme Court in People v. Love, 53 Cal.2d 843, 3 Cal.Rptr. 665, 350 P.2d 705, (1960).

"There is * * * no legitimate finding and it is not a matter of common knowledge, that capital punishment is or is not a more effective deterrent than imprisonment."

We have heretofore upheld the constitutionality of the Arizona death penalty and are not here constrained to capitulate to a

**2.** The last execution in Arizona was in March of 1963. Elsewhere, lack of use of the death penalty has virtually abolished capital punishment in many states in which the law still allows it. From the peak year of 1935 when 199 persons were executed in the United States, the number has been dramatically reduced: 1962, fifteen; 1963, twenty-one; 1964, fifteen; 1965, seven; 1966, one; 1967, two; 1968 none; 1969, none; and none to date of this opinion in 1970. On the national level federal penal institutions maintain no means for carrying out the death sentence; state facilities are used whenever necessary. But only one federal prisoner has been executed since 1957. In the armed forces, the last execution in the Army took place on April 13, 1961; the last execution in the Navy was on December 6, 1942.

**3.** Maxwell v. Bishop, Sup't., Arkansas State Penitentiary, No. 13, October Term, 1969. This opinion has been delayed with the hope that a decision from the High Court would precede it, but we have now decided to act without the benefit of such.

contrary view. As said by this Court in State v. Boggs, 103 Ariz. 328, 441 P.2d 778 (1968):

"* * * defendant contends that the Arizona statutes providing for the death penalty are unconstitutional as being violative of the cruel-and-unusual punishment prohibitions of the Eighth and Fourteenth Amendments of the United States Constitution and of Article II, Section 15, of the Arizona Constitution, A.R.S. We hold that the imposition of the death penalty for a first-degree murder conviction is not violative of the cruel-and-unusual-punishment prohibitions of either the United States or Arizona constitutions.

In Jackson v. Dickson (9th Cir. 1963), 325 F.2d 573, the court, in upholding the death penalty, stated:

'A long series of decisions of the Supreme Court has held or stated that the death penalty, as such, is neither cruel nor unusual.' * * * (Cases cited.)

In Arizona the death penalty has been upheld recently in State v. Janovic, 101 Ariz. 203, 417 P.2d 527; State v. Alford, 98 Ariz. 124, 402 P.2d 551; and State v. Jones, 95 Ariz. 4, 385 P.2d 1019. See also Hernandez v. State, 43 Ariz. 424, 32 P.2d 18, where this Court held that the 1933 Arizona Constitutional Amendment, Art. 22, Sec. 22, prescribing lethal gas for execution of death penalty was not violative of the Eighth Amendment of the United States Constitution as imposing cruel and unusual punishment."

Any change must lie with the Arizona Legislature and/or the United States Supreme Court.

The defendant has committed a heinous crime, the sheer brutality of which unquestionably shocked the jury of twelve citizens who decreed that he should die. His trial testimony on the issue of self-defense was unbelievable and repulsive. Had he been of mature age the death penalty clearly would have been proper and the verdict would have gone undisturbed by this Court.

We have stated, and then reiterated on many occasions, that the power to revise and reduce sentences under A.R.S. §§ 13–1716 and 13–1717 should be used with great caution, and exercised only when it clearly appears a sentence is too severe. See, e. g., State v. Corrales, 95 Ariz. 401, 391 P.2d 563 (1964); State v. Valenzuela, 98 Ariz. 189, 403 P.2d 286 (1965).

Against the facts of this case and the difficult yardstick of the law on capital punishment, we lay the proposition of a 15 year old boy and the terminology of A.R.S. § 13–1717, subsec B:

"Upon an appeal from the judgment or from the sentence on the ground that it is excessive, the court shall have the power to reduce the extent or duration of the punishment imposed, if, in its opinion, the conviction is proper, but the punishment imposed is greater than under the circumstances of the case ought to be inflicted. In such a case, the supreme court shall impose any legal sentence, not more severe than that originally imposed, which in its opinion is proper. Such sentence shall be enforced by the court from which the appeal was taken."

Because of his immaturity we are persuaded that he should not die and the punishment on Count II is therefore reduced from death to life imprisonment in the state prison.

As so modified the judgment of the Superior Court of Maricopa County is affirmed as to Count II. As to Count I the conviction is reversed and remanded for proceedings not inconsistent with this opinion.

LOCKWOOD, C. J., STRUCKMEYER, V. C. J., and UDALL and McFARLAND JJ., concur.

Justice JACK D. H. HAYS did not participate in the determination of this matter, therefore, Judge LAURANCE T. WREN was called in to sit in his stead and participate in the determination of this case.