498 P.2d 454

The STATE of Arizona, Appellee,
v.
Robert Dean ENDRESON, Appellant.
No. 2059.

Supreme Court of Arizona,
In Banc.
June 23, 1972.
Rehearing Denied Sept. 12, 1972.

Gary K. Nelson, Atty. Gen., by William P. Dixon, Asst. Atty. Gen., Phoenix, for appellee.

Wilkinson & Quarelli, by O. J. Wilkinson, Jr., Phoenix, for appellant.

CAMERON, Vice Chief Justice.

This is an appeal from a judgment of guilt and a sentence of death entered against the defendant following a plea of guilty to first degree murder.

We are asked to answer three questions on appeal:

1. Did the trial court err in accepting defendant's guilty plea?

2. Did the trial court err in sentencing defendant to death?

3. Is the death penalty cruel and unusual?

The facts necessary for a determination of this matter are as follows. On 12 March 1968 a woman by the name of Mrs. Sylvia Presley was shot to death in the walk-in cooler of a Circle K market. On 22 March 1968 a Phoenix police officer and an officer from the Maricopa County Sheriff's Office interviewed the defendant at the Federal Detention Center in Florence concerning the murder of Mrs. Presley. After advising defendant of his constitutional rights and after defendant had informed the officers that he would tell them what he wanted to tell them and that he did not need an attorney, the officers began questioning the defendant concerning the murder of Mrs. Presley. Initially, defendant denied having killed her but admitted that his gun had been used. Later, however, defendant admitted killing Mrs. Presley. Defendant told the officers that he had gone to the Circle K market to buy some shotgun shells; that Mrs. Presley told him he was too young (he was 20 years old); that he pulled a pistol from his shoulder holster and ordered Mrs. Presley into the walk-in cooler; that he later ordered her to lie down; and then, because she made a movement which defendant felt may have been an attempt to grab a coke bottle, he shot her twice in the side and four times in the back. Defendant told the officers he left with $130 which he had taken from the cash register.

On 2 April 1968 a preliminary hearing was held at which time defendant was ordered to be held without bond to answer the charge of first degree murder of Mrs. Sylvia Presley. In the Superior Court, counsel for defendant petitioned for appointment of medical experts, pursuant to Rule 250, Rules of Criminal Procedure, 17 A.R.S., and moved for a hearing on the voluntariness of defendant's confession which he made to officers Ysasi and Calles at the Detention Center in Florence. On 12 September 1968 defendant's petition for appointment of medical experts was granted, and defendant was ordered to be taken to the Arizona State Hospital for testing and evaluation as to his competency to stand trial, his propensity for violent or dangerous behavior, his present mental condition, and his mental condition at the time of the alleged crime. On 18 October 1968 counsel for both parties agreed to submit the matter of defendant's mental condition to the court on the basis of the psychiatric reports he had received. The court found, among other things, that the defendant was able to understand the nature of the proceedings against him and was able to assist in his own defense. The court, at that time, also set a date for the hearing on the voluntariness of defendant's confessions. On 23 October 1968 the voluntariness hearing was held at which time both Officers Ysasi and Calles testified that they had advised defendant of his constitutional rights before interrogating him at the Detention Center, that the defendant had initialed their "Miranda cards" as evidence of this fact, and that defendant had unequivocally stated he did not want or need an attorney and that he would tell the officers what he wanted to tell them and no more. At the conclusion of this hearing, the court took the matter under advisement. On 18 November 1968 the court determined that defendant's confessions were voluntarily made and thus denied the motion to suppress the confessions.

At this time the defendant appeared to change his plea from not guilty to first degree murder to guilty to first degree murder. After a lengthy exchange between the court and the defendant and his attorney, the court entered its finding that the

defendant knowingly, voluntarily, and intelligently desired to plead guilty to first degree murder.

On 25 March 1969 a hearing in mitigation and aggravation was held at which time the arguments by both counsel centered on the propriety of the death penalty for Mr. Endreson. Then, on 1 April 1969, after the customary words of allocution addressed to the defendant, the court sentenced defendant to death. On 20 May 1969 the trial court stayed the execution pending judgment on appeal to this court. ·Rule 354, Rules of Criminal Procedure, ·17 A.R.S.

### WAS DEFENDANT'S PLEA OF GUILTY PROPERLY TAKEN?

■ Defendant argues first that the court failed to establish a satisfactory factual basis for first degree murder. First degree murder is defined in § 13–452 A.R.S. as follows:

"Degrees of murder

"A murder which is perpetrated by means of poison or lying in wait, torture or by any other kind of wilful, deliberate and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary or mayhem, is murder of the first degree. * * *."

We believe the following colloquy between the judge and the defendant prior to acceptance of the guilty plea amply supports the State's position that the defendant shot and killed Mrs. Presley in the perpetration of a robbery:

"THE COURT * * * Mr. Endreson, at the time you went in the Circle K Market did you have in mind at that particular time the commission of a robbery?

"DEFENDANT No, Sir.

"Q Did you arrive at such an intent while you were there?

"A That I did, sir.

"Q Did you pull a gun at that time?

"A No, Sir, I went in, sir, to get shells.

"Q Shotgun shells?

"A That's correct, sir. And I was informed that I was too young and I got a little mad and I said, 'We'll see who's too young.' There was no robbery intended. I never even thought about it until afterwards.

"Q You did pull a gun?

"A That's correct, sir.

"Q And did you order this woman into the locker?

"A Yes, I was just going to take her—

"Q —then what happened? Did you order her to lay down on the floor?

"A Yes, I was just going to take the shells, at that time I figured, 'Well, might as well rob it then also because they are going to get me for just as bad anyway; just, I had been there together.

"Q While she was lying there on the floor what happened?

"A She started to raise up with her hand out toward, I don't know whether it was a coke bottle or what bottle, she was lying on the side. And I said 'No,' and she was out, maybe fifteen degree angle from the floor and up, I don't know, she was raised up a little. So I shot her."

■ Defendant further argues that he could not possibly have knowingly, willingly, and voluntarily pled guilty to first degree murder under these circumstances since his doing so had the effect "of granting a license to another human being to take his life." Defendant argues, in effect, that a plea to first degree murder is invalid unless he is given something in return for his plea of guilty—in this case, life imprisonment instead of the death penalty.

Defendant's argument might have some merit had his plea been the result of a "bargain" secured between his counsel and the prosecutor, and had the prosecutor refused to carry out his part of the bargain. However, there is no evidence of a "plea bargain" in the record. On the contrary,

counsel for the defendant, in his brief on appeal, admits that there was no plea bargain entered into on defendant's behalf. Moreover, defendant was fully advised by the sentencing judge that, even after a guilty plea, he might still impose the death penalty if the facts so warranted it:

"THE COURT   Have the Defendant come forward, please. Mr. Endreson, have you discussed this with your attorney?

"DEFENDANT   Yes, sir.

"Q   You are fully aware that this is a charge of first degree murder?

"A   Yes, sir.

"Q   Have your attorneys outlined to you as completely as they could the nature of the evidence that stands in this case or that they contemplate will be brought in this case at the time of trial?

"A   I believe so, sir.

"Q   Has anybody—you fully realize if you enter a plea of guilty to the charge of first degree murder it would then be up to the discretion of the Court and the discretion of the Court is limited in a first degree murder case with only two possible sentences, one would be execution, death in the manner prescribed by the State of Arizona and the other would be a matter of life imprisonment?   Do you fully understand that?

"A   Yes, sir.

"Q   Has there been any promises made to you in any manner as to what this Court would do if you entered a plea of first degree murder in this case?

"A   No, sir, none whatsoever.

"Q   Are you fully cognizant that the Court, after full investigation, may feel that the punishment of death is warranted in this case?

"A   Yes, sir."

We must surmise that the defendant pled guilty in the hope that the judge would be more lenient in sentencing than a jury might have been had he chosen to be tried. The fact that his hope was not fulfilled does not make his plea any less intelligent or voluntary.

The plea in this case was entered prior to Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), and therefore the more rigid standards required by Boykin do not apply to the taking of the guilty plea in this case.   State v. Griswold, 105 Ariz. 1, 457 P.2d 331 (1969). Rather, the taking of the plea must be judged with reference to the basic fairness of the proceedings, State v. Reynolds, 108 Ariz. 314, 497 P.2d 812, filed 8 June 1972;   State v. Ponce, 108 Ariz. 58, 492 P.2d 1165 (1972);   State v. Johnson, 107 Ariz. 169, 484 P.2d 1 (1971).   Due to the severity of the punishment in this case, we have examined the record most carefully, and we conclude that the defendant's plea was made intelligently and voluntarily with full knowledge of the possible consequences.

## DID THE COURT ERR IN IMPOSING THE DEATH PENALTY ON THE DEFENDANT?

Defendant contends that it was an abuse of the sentencing judge's discretion in imposing the death penalty on him in light of the fact that he was, at the time of the crime, only 20 years old.   Defendant cites State v. Maloney, 105 Ariz. 348, 464 P.2d 793 (1970) in support of this argument.   In Maloney we reduced the sentence of the defendant from death to life imprisonment because of the immaturity of the defendant who was only 15 years of age.   We do not feel compelled to do so in this case for, although the defendant was only 20 years old, he evidenced a complete understanding of his actions and in fact was rather bold in his confession to the commission of this crime and of others as well.

The sentencing court, on the motion to suppress, heard extensive testimony concerning the facts in the case and had before it the reports of 3 psychiatrists.   There

**370**

was general agreement that the defendant had a "high potential for violent and dangerous behavior" and that his "criminal tendencies * * * seem to be progressive." A reading of the testimony including the hearing in mitigation and aggravation, as well as the psychiatric reports, indicate that the sentencing court did not abuse its discretion in imposing the death penalty. Neither does a reading of the record in this case indicate that we should, as authorized by statute (§ 13–1717, subsec. B A.R.S.) and as requested by the defendant, reduce the sentence imposed by the trial court.

## IS THE DEATH PENALTY CRUEL AND UNUSUAL?

Defendant further argues that the death penalty was erroneously imposed in that it violates the Eighth Amendment to the United States Constitution and Art. 2, § 15 of the Arizona Constitution, A.R.S., which protects a defendant from cruel and unusual punishment. As we stated in State v. Maloney, supra, we are aware of the debate which has long gone on in this country over the propriety of the death penalty. We are also aware of the fact that just recently the Supreme Court of California found the death penalty to be both cruel *and* unusual and held it violative of its own state constitution. People v. Anderson, 6 Cal.3d 628, 100 Cal.Rptr. 152, 493 P.2d 880, decided 18 February 1972, modified 17 March 1972. In addition, there are presently pending three cases before the United States Supreme Court challenging the death penalty as being contrary to the United States Constitution: Aikens, Jr. v. California, No. 68–5027; Furman v. Georgia, No. 69–5003; Jackson, Jr. v. Georgia, No. 69–5030. It is the opinion of this court that the death penalty is not "cruel and unusual punishment" under Article 2, § 15 of the Arizona Constitution and that the question of the abolishment of the death penalty under the Arizona Constitution is a question properly left to the legislature or the people of this State through constitutional amendment. Unless and until the United States Supreme Court

orders us to do otherwise, or until the Arizona legislature sees fit to abolish the use of the death penalty in this State, we will continue to uphold its constitutionality and affirm its imposition when, because of aggravating circumstances, it is warranted.

Judgment affirmed.

HAYS, C. J., and STRUCKMEYER, LOCKWOOD and HOLOHAN, JJ., concur.