JUSTICE PELANDER, opinion of the Court:
 

 ¶1 This automatic appeal arises from Jason Eugene Bush's convictions and death sentences for murdering nine-year-old Brisenia Flores and her father, Raul "Junior" Flores, in their Arivaca home. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution and A.R.S. §§ 13-4031 and 13-4033(A)(1).
 

 BACKGROUND
 

 ¶2 The facts largely mirror those in
 
 State v. Forde
 
 , in which this Court affirmed the first degree murder convictions and death sentences of Shawna Forde, Bush's accomplice and the "self-proclaimed leader of a private 'minuteman' border monitoring group" in which Bush participated.
 
 233 Ariz. 543
 
 , 552 ¶ 2,
 
 315 P.3d 1200
 
 , 1209 (2014). On the evening of May 29, 2009, Junior Flores, his wife, Gina Gonzales, and their daughter, Brisenia, were at their home while the couple's other daughter spent the night with a relative. After Junior and Gina went to bed, and as Brisenia slept on the living room couch, Junior woke Gina to tell her law enforcement officers were at their door. Gina rose from bed and joined Brisenia, who was still asleep on the couch, while Junior went to the door.
 

 ¶3 Gina heard two voices, a male and female, order Junior to open the door so they could enter to "take a look." Junior complied, and a man and woman entered the Flores's home. The man was tall, wore camouflage and black face paint, and carried a handgun and a longer gun covered with duct tape. Junior pressed the intruders for identification and asked the man why one gun was covered in duct tape. The man responded, "Don't take this personally but this bullet has your name on it," and shot Junior in the chest. The man then turned the handgun on Gina and shot her in the shoulder and thigh. After Gina fell to the floor, the man focused again on Junior, who was yelling, "Stop shooting my wife," and killed him with additional shots.
 

 ¶4 Lying on the floor feigning death, Gina heard two more men, both Spanish-speaking, enter the home. Brisenia awoke, began crying, and asked the armed man why he shot her father. He told Brisenia everything would be okay, that nobody would hurt her, and asked about her sister's whereabouts. Brisenia said her sister was spending the night with a relative. Gina then heard the man load his gun while Brisenia repeatedly begged, "Please don't shoot me." Despite her pleas, the man fatally shot Brisenia twice in the face at point-blank range.
 

 ¶5 After hearing the female intruder tell the group to leave, Gina called 911 and attempted to aid Brisenia, who was shaking and struggling to breathe. The female intruder then returned, saw that Gina was still alive, and ordered someone to "go back and finish her off." Gina immediately rushed to the kitchen, grabbed a gun Junior kept there, and collapsed on the kitchen floor. Meanwhile, the tall man with black face paint reentered the home and began shooting at Gina, who returned fire. Gina heard the man cry out in pain before leaving the home. When another man entered, Gina yelled, "Get the hell out," and "That is enough," which prompted the man to leave. Gina returned to the phone, which was still connected to the 911 dispatcher, and waited for police.
 

 ¶6 Law enforcement officers identified Albert Gaxiola as a suspect in the murders and, after obtaining a search warrant, discovered Bush's DNA, fingerprints, and other incriminating items at Gaxiola's home. Officers located Bush ten days later at the residence he shared with his girlfriend. Bush, who had been wounded by Gina's gunfire, told his
 girlfriend that he had been shot in the leg while working for the military as an undercover immigration operative.
 

 ¶7 After arresting Bush on June 11, 2009, officers questioned him at the Mohave County Sheriff's Department for approximately four hours. Though initially denying any involvement in the murders, Bush eventually confessed to shooting and killing Junior and Brisenia, claiming that his accomplices threatened to kill him and his family if he did not do so. In addition to making numerous incriminating statements, Bush drew a diagram of the Flores's home and marked where each victim was when he shot them. The State charged Bush with two counts of first degree murder, A.R.S. § 13-1105, attempted first degree murder, A.R.S. § 13-1001, two counts of aggravated assault, A.R.S. § 13-1204, first degree burglary, A.R.S. § 13-1508, armed robbery, A.R.S. § 13-1904, and aggravated robbery, A.R.S. § 13-1903.
 

 ¶8 A jury found Bush guilty on all counts. For the murder convictions, the jury found three aggravating circumstances: Bush was convicted of a serious offense, committed multiple homicides on the same occasion, and murdered a person under the age of fifteen.
 
 See
 
 A.R.S. § 13-751(F)(2), (8), (9). Considering those factors and the mitigation evidence, the jury sentenced Bush to death for each murder. For the non-capital convictions, the trial court sentenced Bush to prison terms totaling seventy-eight years.
 

 DISCUSSION
 

 A. Pretrial Motions for a Change of Venue and Continuance
 

 ¶9 Bush contends the trial court abused its discretion in denying his motion for a change of venue or, alternatively, a continuance, which he argues was necessary because of outrageous and extensive pretrial publicity about the case. We review for abuse of discretion a trial court's denial of a motion for a change of venue or continuance.
 
 Forde
 
 ,
 
 233 Ariz. at
 
 553 ¶ 11,
 
 315 P.3d at
 
 1210 ;
 
 State v. Dixon
 
 ,
 
 226 Ariz. 545
 
 , 555 ¶ 53,
 
 250 P.3d 1174
 
 , 1184 (2011).
 

 ¶10 Bush's motion, filed a week before his trial, cited numerous internet articles allegedly containing "an overwhelming amount of prejudicial and inflammatory statements" about him. In denying the motion, the trial court reasoned that Bush had not shown he was entitled to a presumption of prejudice and could not show actual prejudice because the jury had not yet been selected. The court indicated it would explore Bush's concerns if the voir dire process failed to "yield an impartial jury." Bush unsuccessfully moved for a mistrial after jury selection but did not renew his motions for a change of venue or continuance.
 

 ¶11 Our review of pretrial publicity issues "entails a two-step inquiry to decide 'whether, under the totality of the circumstances, the publicity attendant to [the] defendant's trial was so pervasive that it caused the proceedings to be fundamentally unfair.' "
 
 Forde
 
 ,
 
 233 Ariz. at
 
 553 ¶ 12,
 
 315 P.3d at 1210
 
 (quoting
 
 State v. Cruz
 
 ,
 
 218 Ariz. 149
 
 , 156 ¶ 13,
 
 181 P.3d 196
 
 , 203 (2008) ). The first inquiry is whether "the publicity so pervaded the proceedings that the trial court erred by not presuming prejudice."
 

 Id.
 

 at 554 ¶ 12,
 
 315 P.3d at
 
 1211 ;
 
 accord
 

 Cruz
 
 ,
 
 218 Ariz. at
 
 156 ¶ 14,
 
 181 P.3d at 203
 
 . If the trial court properly declined to presume prejudice, the next inquiry is "whether the defendant showed actual prejudice."
 
 Forde
 
 ,
 
 233 Ariz. at
 
 554 ¶ 12,
 
 315 P.3d at
 
 1211 ;
 
 accord
 

 Cruz
 
 ,
 
 218 Ariz. at
 
 156 ¶ 14,
 
 181 P.3d at 203
 
 . We find no error under either inquiry.
 

 ¶12 Courts "rarely presume prejudice due to outrageous pretrial publicity,"
 
 State v. Bible
 
 ,
 
 175 Ariz. 549
 
 , 564,
 
 858 P.2d 1152
 
 , 1167 (1993), because of the defendant's extremely heavy burden to show "the publicity [is] 'so unfair, so prejudicial, and so pervasive that [the trial court] cannot give any credibility to the jurors' answers during voir dire,' "
 
 Cruz
 
 ,
 
 218 Ariz. at
 
 157 ¶ 15,
 
 181 P.3d at 204
 
 (quoting
 
 State v. Bolton
 
 ,
 
 182 Ariz. 290
 
 , 300,
 
 896 P.2d 830
 
 , 840 (1995) );
 
 accord
 

 Bible
 
 ,
 
 175 Ariz. at 564-65
 
 ,
 
 858 P.2d at 1167-68
 
 . "In other words, ... the 'media coverage [must be] so extensive or outrageous that it permeate[s] the proceedings or create[s] a 'carnival-like' atmosphere,' "
 
 Cruz
 
 ,
 
 218 Ariz. at
 
 157 ¶ 15,
 
 181 P.3d at 204
 
 (quoting
 
 State v. Atwood
 
 ,
 
 171 Ariz. 576
 
 , 631,
 
 832 P.2d 593
 
 , 648 (1992) ), devoid of the "fundamental and essential element[s] of ... 'dignity, order, and decorum,' "
 
 Bible
 
 ,
 
 175 Ariz. at 567
 
 ,
 
 858 P.2d at 1170
 
 (quoting
 
 Illinois v. Allen
 
 ,
 
 397 U.S. 337
 
 , 343,
 
 90 S.Ct. 1057
 
 ,
 
 25 L.Ed.2d 353
 
 (1970) ).
 

 ¶13 Bush argues that pretrial publicity created the prohibited carnival-like atmosphere in his proceedings. But in
 
 Forde
 
 , which involved the same murders underlying this case, we noted that "[m]ost of the publicity occurred in the immediate aftermath of the crimes-approximately eighteen months before [Forde's] trial," and "most news accounts were essentially factual."
 
 233 Ariz. at
 
 554 ¶ 14,
 
 315 P.3d at
 
 1211 ;
 
 see also
 

 State v. Kiles
 
 ,
 
 222 Ariz. 25
 
 , 35-36 ¶¶ 46-50,
 
 213 P.3d 174
 
 , 184-85 (2009) (change of venue denied despite ten years of media coverage).
 

 ¶14 Questionable or allegedly inaccurate publicity alone is not enough to presume prejudice, particularly when, as here, the "information in the great bulk of the news reports" was "largely factual."
 
 Bible
 
 ,
 
 175 Ariz. at 564
 
 ,
 
 858 P.2d at 1167
 
 . Nor does a presumption of prejudice arise merely because the media published an interview to which Bush agreed, or other articles stating that he confessed to the murders or discussing facts adduced during Forde's trial that implicated Bush in the murders. In short, Bush has not shown that "the media successfully influenc[ed] law enforcement officers[,] ... court personnel[,] [or] the court itself."
 

 Id.
 

 at 565
 
 ,
 
 858 P.2d at 1168
 
 .
 

 ¶15 "Absent presumed prejudice, the focus is whether the potential jurors 'could not judge impartially the guilt of the defendant.' "
 

 Id.
 

 at 566
 
 ,
 
 858 P.2d at 1169
 
 (quoting
 
 Patton v. Yount
 
 ,
 
 467 U.S. 1025
 
 , 1035,
 
 104 S.Ct. 2885
 
 ,
 
 81 L.Ed.2d 847
 
 (1984) ). To prevail, the defendant must show that "the dissemination of the prejudicial material will probably result in the party being deprived of a fair trial." Ariz. R. Crim. P. 10.3(b) (2011);
 
 see also
 

 Bible
 
 ,
 
 175 Ariz. at 566-67
 
 ,
 
 858 P.2d at 1169-70
 
 (applying Rule 10.3(b) ). Bush fails to make that required showing.
 

 ¶16 Bush's actual prejudice argument primarily rests on the allegedly "inconsistent answers" Jurors 1, 5, 11, and 13 gave about their exposure to pretrial publicity. But all empaneled jurors disclosed their preliminary opinions regarding Bush's guilt and provided adequate assurances they would set their opinions aside and consider only the evidence presented at trial. These assurances plainly "undercut [his] prejudice claim."
 
 Bible
 
 ,
 
 175 Ariz. at 566
 
 ,
 
 858 P.2d at 1169
 
 . Additionally, nothing in the record supports departing from the well-established presumption that the jurors followed the trial court's instructions to consider only the evidence presented at trial.
 
 Cruz
 
 ,
 
 218 Ariz. at
 
 158 ¶ 25,
 
 181 P.3d at 205
 
 . The court did not abuse its discretion in denying Bush's motion for a change of venue.
 

 ¶17 Because Bush failed to show that the pretrial publicity prejudiced him, we likewise reject his claim of error relating to his motion for a continuance.
 
 State v. Burns
 
 ,
 
 237 Ariz. 1
 
 , 11 ¶ 10,
 
 344 P.3d 303
 
 , 313 (2015) ("We will not find that a trial court abused its discretion in denying a continuance unless the defendant shows prejudice.").
 

 B. Jury Selection and Voir Dire Issues
 

 1. Non-statutory Aggravators in Juror Questionnaire
 

 ¶18 Jury selection in this case lasted five days and involved 225 potential jurors. Before trial, each juror received and completed an eighteen-page juror questionnaire containing many questions probing the juror's ability to deliver a fair and impartial verdict. In various ways, the questionnaire delved into the prospective jurors' views on capital punishment, and some questions sought to identify jurors who might harbor death-favorable views. The State and Bush's defense team received copies of the prospective jurors' completed questionnaires. In addition, the trial court conducted three voir dire sessions in which subgroups of prospective jurors were sworn in, instructed on the phases of a capital murder trial, and made available to the parties for questioning.
 

 ¶19 Bush contends the trial court erred by allowing the State, through the juror questionnaire, to "improperly inject non-statutory aggravating factors ... for consideration by prospective jurors." Bush's
 argument is based on question 27, which stated:
 

 27. If you agree the death penalty may be appropriate in some cases, please rank the following reasons from 1 to 4, 1 being most important, that would cause you to favor the death penalty.
 

 ____ To deter others from committing murder.
 

 ____ For economic reasons. It is expensive to house prisoners for the remainder of their lives.
 

 ____ Because an eye for an eye, is fair.
 

 ____ To protect the public against defendants who might get out of jail in the future.
 

 ____ Other (please specify): ______________________.
 

 ¶20 "We review a trial court's decisions regarding the use and content of jury questionnaires for abuse of discretion,"
 
 State v. Naranjo
 
 ,
 
 234 Ariz. 233
 
 , 241 ¶ 24,
 
 321 P.3d 398
 
 , 406 (2014), and "will not disturb the trial court's selection of the jury in the absence of a showing that a jury of fair and impartial jurors was not chosen,"
 
 State v. Moody
 
 ,
 
 208 Ariz. 424
 
 , 451 ¶ 93,
 
 94 P.3d 1119
 
 , 1146 (2004) (internal quotation marks omitted) (quoting
 
 State v. Walden
 
 ,
 
 183 Ariz. 595
 
 , 607,
 
 905 P.2d 974
 
 , 986 (1995) ).
 

 ¶21 Despite having been furnished in advance with the trial court's proposed questionnaire, Bush did not object to question 27 or any other part. Instead, after the prospective jurors received, completed, and submitted their questionnaires, but before voir dire began, Bush moved for a mistrial on the ground that question 27 "engrained in [the jurors] that it is appropriate at some level for them to consider" the "improper and impermissible" non-statutory aggravating factors it lists. The trial court denied the motion but instructed the potential jurors that they were not to consider the factors listed in question 27. The court also asked the potential jurors whether they would disregard that instruction, but no juror indicated any such intent.
 

 ¶22 The trial court's instruction and follow-up query notwithstanding, defense counsel still "ask[ed] each [potential juror] individually" about whether they could "put those [reasons listed in question 27] aside" as non-factors and be fair and impartial. But in his further probing of the prospective jurors, counsel confusingly stated he was not "saying [they] can't think about these [factors]." The trial court later clarified that defense counsel's follow-up questioning was meant to determine whether the factors listed in question 27 are "still going to be something that you consider even if the Court instructs you [otherwise]."
 

 ¶23 In response to Bush's questioning, and contrary to their prior statements that they would follow the trial court's instructions on this point, petit Jurors 9, 11, and 13 indicated by raising their hands that they would consider a factor listed in question 27. Even so, and despite insisting he would move to strike any jurors who indicated they would consider question 27's factors, Bush did not move to strike any of these jurors.
 

 ¶24 Arizona law provides fourteen "aggravating circumstances" that, if alleged by the state, a capital case jury shall consider "in determining whether to impose a sentence of death." A.R.S. § 13-751(F). Bush contends that "question 27 called jurors' attention to non-statutory aggravating factors" and that he is entitled to a new trial because the final response of Jurors 9, 11, and 13 during voir dire indicates that "at least [their] verdicts were influenced by improper considerations."
 

 ¶25 We disagree. On its face, question 27 does not instruct jurors that the reasons it lists are aggravating factors, but rather expressly states that its purpose is to determine what reasons would lead a particular juror to "favor the death penalty" if given that sentencing option. Moreover, the trial court and the parties explained several times that each juror must follow the court's instructions generally and that jurors were not to consider the factors question 27 mentions. We presume the jurors heeded those instructions,
 
 Cruz
 
 ,
 
 218 Ariz. at
 
 158 ¶ 25,
 
 181 P.3d at 205
 
 , and Bush's assertion that the reasons listed in question 27 influenced any juror's deliberation or decision is purely speculative.
 

 ¶26 Bush nevertheless contends that the post-instruction, show-of-hand responses made by Jurors 9, 11, and 13 indicate inadequate
 rehabilitation. But those conflicting responses at most suggest the jurors did not understand the purpose or substance of defense counsel's questioning. And to the extent there was confusion, it was at least partially attributable to counsel's misguided statement to the prospective jurors that "we're not saying you can't think about these [factors]."
 

 ¶27 In any case, later in the jury selection process the trial court asked if any prospective jurors "would be unable to follow the law" as given in the court's instructions, "disregarding [their] own notions of what the law is" or "ought to be." No juror responded or expressed any concern. In addition, during voir dire and later in the aggravation phase the prosecutor and the trial court clearly explained the separate phases of a capital case trial, the distinct issues the jurors would have to decide in each phase, and the three aggravators the State alleged. The court's aggravation-phase instructions expressly stated that "the State has the burden of proving beyond a reasonable doubt the aggravating circumstances it has alleged," all of which are listed in § 13-751(F). Bush fails to rebut the presumption that the jurors followed the court's instructions.
 
 See
 

 State v. Prince
 
 ,
 
 226 Ariz. 516
 
 , 537 ¶ 80,
 
 250 P.3d 1145
 
 , 1166 (2011).
 

 ¶28 In sum, the trial court did not abuse its discretion in allowing the prospective jurors to answer question 27 of the juror questionnaire. Nonetheless, we see little purpose for, and a potential risk of confusion and possible prejudice created by, a question such as question 27. We therefore disapprove of its future use in capital case pretrial juror questionnaires.
 

 2. Denial of Individual Voir Dire
 

 ¶29 Bush contends the trial court violated his constitutional rights to a fair trial and due process by denying his request for individual voir dire. "We review a trial court's rulings on
 
 voir dire
 
 of prospective jurors for abuse of discretion,"
 
 State v. Glassel
 
 ,
 
 211 Ariz. 33
 
 , 45 ¶ 36,
 
 116 P.3d 1193
 
 , 1205 (2005), and necessarily defer largely to a trial court's "sound discretion" in such matters,
 
 Ristaino v. Ross
 
 ,
 
 424 U.S. 589
 
 , 594,
 
 96 S.Ct. 1017
 
 ,
 
 47 L.Ed.2d 258
 
 (1976) (internal quotation marks omitted) (quoting
 
 Connors v. United States
 
 ,
 
 158 U.S. 408
 
 , 413,
 
 15 S.Ct. 951
 
 ,
 
 39 L.Ed. 1033
 
 (1895) ).
 

 ¶30 Bush moved before trial for individual, sequestered, and in-chambers voir dire, asserting it was necessary to "put the prospective juror at ease and encourage honest responses." The trial court denied the motion, noting that Bush's request was impracticable because of the large number of potential jurors. But the court said it would privately question a prospective juror "if that need became apparent" either from the juror's request or to avoid tainting the other prospective jurors. Based on the same reasoning, the trial court denied Bush's two subsequent filings seeking individual voir dire.
 

 ¶31 Notwithstanding the trial court's rulings, during the first day of voir dire defense counsel asked individualized questions to make sure the jurors were being "honest with [him]." The court took issue with the inefficient and ineffective manner of his questioning, but counsel insisted that he "ha[d] the right to ask [jurors] individually" because the juror questionnaire "implanted in their mind" that the factors listed in question 27 were appropriate. The trial court ultimately gave counsel considerable "leeway," such that his extensive and uninterrupted voir dire questions were a mixture of individual and group inquiries.
 

 ¶32 Relying in part on
 
 Morgan v. Illinois
 
 ,
 
 504 U.S. 719
 
 ,
 
 112 S.Ct. 2222
 
 ,
 
 119 L.Ed.2d 492
 
 (1992), Bush contends that individualized voir dire was constitutionally required in his "complex, highly publicized capital trial." But
 
 Morgan
 
 merely requires trial courts to allow "more detailed questioning of prospective jurors beyond ... simple questions" to "evaluat[e] a prospective juror's ability to be impartial."
 
 State v. Garza
 
 ,
 
 216 Ariz. 56
 
 , 64 ¶ 25,
 
 163 P.3d 1006
 
 ,1014 (2007) ;
 
 see also
 

 State v. Parker
 
 ,
 
 231 Ariz. 391
 
 , 400 ¶ 21,
 
 296 P.3d 54
 
 , 63 (2013) ("We have repeatedly rejected invitations to expand
 
 Morgan
 
 's holding."). And unlike in
 
 Morgan
 
 , the trial court here did not "refuse inquiry into whether a potential juror would automatically impose the death penalty upon conviction of the defendant."
 
 504 U.S. at 721
 
 ,
 
 112 S.Ct. 2222
 
 . Nor does Bush
 identify any occasion on which he unsuccessfully asked for voir dire of a specific juror individually.
 
 Cf.
 

 State v. Moore
 
 ,
 
 222 Ariz. 1
 
 , 10 ¶ 36,
 
 213 P.3d 150
 
 , 159 (2009) (finding no
 
 Morgan
 
 error when defendant "was allowed to question the jurors" and "[t]he trial court did not prevent defense counsel from asking life-qualifying questions"). Instead, the record shows that Bush had ample time and opportunity to probe the prospective jurors on their juror questionnaire responses, pretrial publicity, and other matters.
 
 See
 

 Garza
 
 ,
 
 216 Ariz. at
 
 64 ¶ 25,
 
 163 P.3d at 1014
 
 (concluding that voir dire consisting of "extensive oral questioning and ... a twenty-four page questionnaire completed by all prospective jurors" "complied with
 
 Morgan
 
 ").
 

 ¶33 To the extent Bush suggests individual voir dire was necessary to prevent prospective jurors' answers from tainting the panel, we disagree. As in
 
 Bible
 
 , "the written questionnaire addressed many of the questions that might normally militate in favor of individualized ... or in camera voir dire," and Bush "cites no 'contaminating' comment made during oral voir dire."
 
 175 Ariz. at 570
 
 ,
 
 858 P.2d at
 
 1173 ;
 
 accord
 

 Forde
 
 ,
 
 233 Ariz. at
 
 560 ¶¶ 55-56,
 
 315 P.3d at 1217
 
 . Accordingly, the trial court did not abuse its discretion in denying individualized voir dire.
 
 See
 

 Bible
 
 ,
 
 175 Ariz. at 570
 
 ,
 
 858 P.2d at 1173
 
 ("Whatever the risk of the procedure used, the danger did not materialize.").
 

 3. Exclusion of Evidence from Voir Dire
 

 ¶34 During the second day of voir dire, Bush moved to present to prospective jurors some graphic photographs of the murder victims and a tape recording of Gina's 911 call that the State intended to introduce as evidence at trial. Though acknowledging that this was a "novel idea that's generally not permitted during voir dire," Bush contended it was necessary to identify jurors who, after seeing the photographs and hearing the recording, would be "substantially impaired" from being fair and impartial during the mitigation phase. Bush argues that the trial court abused its discretion and violated his constitutional rights to a fair trial and due process by denying his request.
 

 ¶35 Although we generally review a trial court's voir dire rulings for abuse of discretion,
 
 State v. Patterson
 
 ,
 
 230 Ariz. 270
 
 , 273 ¶ 5,
 
 283 P.3d 1
 
 , 4 (2012), fundamental error review applies to Bush's constitutional claims because he did not raise them at trial,
 
 State v. Henderson
 
 ,
 
 210 Ariz. 561
 
 , 567 ¶ 19,
 
 115 P.3d 601
 
 , 607 (2005) (noting that "[a] defendant who fails to object at trial forfeits the right to obtain appellate relief except in those rare cases" involving fundamental error). Bush must therefore show error that is both fundamental and prejudicial.
 
 Id
 
 . ¶ 20.
 

 ¶36 Voir dire is "not meant to allow a defendant to 'ask a juror to speculate or precommit on how that juror might vote based on any particular facts.' "
 
 State v. Smith
 
 ,
 
 215 Ariz. 221
 
 , 231 ¶ 42,
 
 159 P.3d 531
 
 , 541 (2007) (quoting
 
 United States v. McVeigh
 
 ,
 
 153 F.3d 1166
 
 , 1207 (10th Cir. 1998) ). Nor must a trial court allow a defendant to ask questions "designed to condition the jurors to damaging evidence expected to be presented at trial and to commit them to certain positions prior to receiving the evidence."
 
 State v. Melendez
 
 ,
 
 121 Ariz. 1
 
 , 3,
 
 588 P.2d 294
 
 , 296 (1978). Rather, "part of the guarantee of a defendant's right to an impartial jury is an
 
 adequate voir dire
 
 to identify unqualified jurors."
 
 Morgan
 
 ,
 
 504 U.S. at 729
 
 ,
 
 112 S.Ct. 2222
 
 (emphasis added);
 
 see also
 

 Burns
 
 ,
 
 237 Ariz. at
 
 13 ¶ 21,
 
 344 P.3d 303
 
 (rejecting argument that
 
 Morgan
 
 entitles defendant "to ask whether [potential jurors] would impose the death penalty based on the specific facts of his case"). Here, Bush was allowed to question potential jurors on whether the anticipated evidence would prevent them from being fair and impartial.
 

 ¶37 In his voir dire questioning, Bush repeatedly referred to this case as involving "first degree, premeditated, cold-blooded, inexcusable murder" and vividly described the "gruesome photographs" and other "gut-wrenching" evidence that would be presented. Because Bush's statements sufficiently informed the potential jurors about the graphic nature of the evidence in the case, exposing them to the 911 tape and photographs would have unnecessarily risked conditioning the jurors to the State's damaging evidence.
 
 See
 

 Melendez
 
 ,
 
 121 Ariz. at 3
 
 ,
 
 588 P.2d at 296
 
 . As such, the trial court did not err in precluding Bush from presenting that evidence during voir dire.
 

 4. Failure to Strike Jurors Sua Sponte
 

 ¶38 Bush argues that the trial court committed structural error and violated his rights "to due process and a fair trial by an impartial jury, and ... to be free from cruel and unusual punishment" under the federal and Arizona constitutions by failing to strike sua sponte four allegedly "death-presumptive jurors" who served on the petit jury. Specifically, he contends the court erred by not striking Jurors 2, 3, 8, and 9 because they allegedly "made death-presumptive statements in their questionnaires for which they were never rehabilitated." We find no structural or other error.
 

 ¶39 During the jury selection process the trial court dismissed forty-five potential jurors for cause, including several whom Bush moved to strike because he believed they would automatically vote to impose a death sentence. Bush did not move to strike empaneled Jurors 2, 3, 8, or 9. But after voir dire he moved for a mistrial based "on the entire way [the jury selection] process has been conducted" and argued that some prospective, stealth jurors, without specifically identifying the four now in question, had "not been forthcoming with information" to shed light on some of their responses in the juror questionnaire. Bush made clear that his motion for mistrial was distinct from his request to strike certain specified prospective jurors he viewed as death-biased. The trial court denied Bush's motion, stating that jury selection "has been an effective process" that resulted in "a panel at this point that is fair and can be impartial and will follow the law."
 

 ¶40 We first reject Bush's assertion that the trial court's failure to sua sponte strike Jurors 2, 3, 8, and 9 resulted in structural error.
 
 State v. Anderson
 
 (
 
 Anderson I
 
 ),
 
 197 Ariz. 314
 
 ,
 
 4 P.3d 369
 
 (2000), on which Bush relies, is inapposite. There, contrary to our rules and case law, the trial court refused the defendant's request for oral voir dire to rehabilitate prospective jurors who generally opposed the death penalty.
 

 Id.
 

 at 319 ¶ 10, 320-21 ¶¶ 13-14,
 
 4 P.3d at 374, 375-76
 
 ;
 
 cf.
 

 Moore
 
 , 222 Ariz. at 10-11 ¶¶ 41-42, 213 P.3d at 159-60 (finding
 
 Anderson I
 
 "not analogous" to situation where trial court failed "to specifically ask jurors if they could set aside their beliefs"). Here, in contrast, the trial court did not deny Bush his right to voir dire, let alone his right to strike jurors based on their allegedly death-presumptive statements. Nor did any of the jurors in question express a belief that "death should be imposed
 
 ipso facto
 
 upon conviction of a capital offense,"
 
 Morgan
 
 ,
 
 504 U.S. at 735
 
 ,
 
 112 S.Ct. 2222
 
 , or otherwise state that he or she would "automatically vote for the death penalty without regard to the mitigating evidence,"
 

 id.
 

 at 738
 
 ,
 
 112 S.Ct. 2222
 
 .
 

 ¶41 Bush alternatively argues that "[f]undamental error analysis does not apply here as [he] specifically objected to the court's voir dire as inadequate and moved for a mistrial." We disagree. Bush does not argue that the trial court erred in denying his motion for a mistrial. And that motion was, at best, a "general objection to death qualification," which is insufficient to preserve issues relating to the qualification of particular jurors.
 
 E.g.
 
 ,
 
 Moody
 
 ,
 
 208 Ariz. at
 
 449-50 ¶ 85,
 
 94 P.3d at 1144-45
 
 . Furthermore, even assuming Bush's oral motion for a mistrial constituted a challenge to the panel, it failed to comply with Arizona Rule of Criminal Procedure 18.4(a), which at all relevant times required such challenges to be "in writing." We therefore review his claim for fundamental error, which requires Bush to show that the trial court's failure to sua sponte strike Jurors 2, 3, 8, and 9 constituted error that was fundamental and prejudicial.
 
 Henderson
 
 ,
 
 210 Ariz. at
 
 567 ¶¶ 19-20,
 
 115 P.3d at
 
 607 ;
 
 see also
 

 Garza
 
 ,
 
 216 Ariz. at
 
 64 ¶¶ 28-29,
 
 163 P.3d at 1014
 
 (reviewing death-biased jury claims for fundamental error);
 
 Bible
 
 ,
 
 175 Ariz. at 573-74
 
 ,
 
 858 P.2d at 1176-77
 
 (same).
 

 ¶42 "When there is reasonable ground to believe that a juror cannot render a fair and impartial verdict, the court, on its own initiative, ... shall excuse the juror from service in the case." Ariz. R. Crim. P. 18.4(b) (2011);
 
 see also
 

 Morgan
 
 ,
 
 504 U.S. at 729
 
 ,
 
 112 S.Ct. 2222
 
 ("The Constitution ... [requires] that the defendant be afforded an impartial jury."). But a potential juror is not precluded
 from jury service "[s]imply because [the] juror favors the death penalty" so long as the juror is "willing to put aside his opinions and base his decisions solely upon the evidence."
 
 State v. Velazquez
 
 ,
 
 216 Ariz. 300
 
 , 307 ¶ 19,
 
 166 P.3d 91
 
 , 98 (2007) (internal quotation marks omitted) (quoting
 
 State v. Martinez
 
 ,
 
 196 Ariz. 451
 
 , 459 ¶ 28,
 
 999 P.2d 795
 
 , 803 (2000) ). Thus, whether fundamental error occurred turns on whether the trial court empaneled jurors who were unwilling to set aside their favorable views of the death penalty.
 

 ¶43 Jurors 2, 3, 8, and 9 each gave responses to some questions in the juror questionnaire that, viewed in isolation, arguably indicate death-favorable views. But Bush's assertion that those jurors "were not asked any follow-up questions on [their] biases" is plainly incorrect. Several questions in the juror questionnaire asked the prospective jurors about their willingness and ability to set their beliefs and views aside and render a fair and impartial verdict based solely on the evidence presented at trial and the court's instructions on the law. Indeed, one of the questions in the juror questionnaire was nearly identical to the United States Supreme Court's
 
 Witherspoon
 
 -
 
 Witt
 
 standard for juror impartiality.
 
 See
 

 Wainwright v. Witt
 
 ,
 
 469 U.S. 412
 
 , 424,
 
 105 S.Ct. 844
 
 ,
 
 83 L.Ed.2d 841
 
 (1985) ;
 
 Witherspoon v. Illinois
 
 ,
 
 391 U.S. 510
 
 , 519-20,
 
 88 S.Ct. 1770
 
 ,
 
 20 L.Ed.2d 776
 
 (1968).
 

 ¶44 Each of the four jurors in question here responded to these questions in a manner indicating they would be fair and impartial. Moreover, the questionnaire stated that jurors were "sworn and instructed to answer [the] questionnaire under oath," such that their "answers will have the effect of a statement given to the Court under oath." Considered in their entirety, the responses made by Jurors 2, 3, 8, and 9 to these questions indicated that, despite any potential bias in favor of, or misunderstanding of the law relating to, the death penalty, they were willing to set their views aside and render a fair and impartial verdict.
 

 ¶45 Bush's claims of juror ineligibility are premised on the mistaken assumption that these jurors' questionnaire responses exposed a death-favorable bias or mitigation impairment that could only be rehabilitated through voir dire. But it does not matter that the jurors' statements assuring their fairness and impartiality were in questionnaire responses.
 
 See
 

 Velazquez
 
 , 216 Ariz. at 307 ¶ 20,
 
 166 P.3d 91
 
 (rejecting a capital defendant's death-biased jury claim based, in part, on a juror's questionnaire response indicating that "he would not automatically impose a death sentence"). And
 
 Anderson I
 
 does not support Bush's contention that a "clear statement of willingness to set aside personal opinions and beliefs [must] appear in the
 
 voir dire
 
 record," as opposed to a juror questionnaire.
 

 ¶46 In any case, the relevant questionnaire responses are not the only evidence in the record of these jurors' fitness for service. During voir dire, the trial court, Bush, and the State explained multiple times the "three phases in a first degree murder trial where the State is seeking the death penalty" so as "to make sure that [each potential juror] fully understood what the jury's role would be in this case." This included detailed explanations of the aggravation and mitigation phases and repeated queries as to whether any prospective juror would "be unwilling or unable ... to listen to [Bush]'s mitigation ... information." Indeed, during defense counsel's questioning of the potential jurors all jurors agreed that a life sentence, not a death sentence, is required for a "first degree, premeditated, cold-blooded, inexcusable murder" unless the State establishes one or more aggravating circumstances. Viewed in its entirety, the jury selection record confirms that "the presence or absence of ... mitigating circumstances [was not] entirely irrelevant" to these jurors.
 
 Morgan
 
 ,
 
 504 U.S. at 729
 
 ,
 
 112 S.Ct. 2222
 
 .
 

 ¶47 In sum, we find no merit to Bush's allegation that "no clear statement of willingness to set aside personal opinions and beliefs appears in the voir dire record." The trial court committed no error, let alone structural or fundamental error, in empaneling Jurors 2, 3, 8, and 9.
 

 C. Confession Issues
 

 1. Admissibility of Evidence of Bush's Confession
 

 ¶48 Detective Navarro testified at trial that after Bush was arrested and received
 
 Miranda
 
 warnings, he voluntarily spoke with detectives for about four hours and, though initially denying any involvement, confessed to having shot the victims. Bush did not object to that testimony and did not cross-examine the detective. Nor did either party offer into evidence the video recording or written transcript of Bush's interrogation.
 

 ¶49 "To be admissible, a statement must be voluntary, not obtained by coercion or improper inducement."
 
 State v. Ellison
 
 ,
 
 213 Ariz. 116
 
 , 127 ¶ 30,
 
 140 P.3d 899
 
 , 910 (2006). Bush argues that his confession was involuntary because the State "extracted [it] using coercive promises" and because his "will was overborne by the State's coercive conduct." But at no point before or during trial did Bush move to suppress evidence of his statements, request a voluntariness hearing, or object to admission of his statements. He therefore forfeited his argument by failing to timely raise any issue about the voluntariness of his confession, as our procedural rules required.
 
 See
 
 Ariz. R. Crim. P. 16.1(b)-(c) (2011).
 

 ¶50 At all relevant times, Arizona Rule of Criminal Procedure 16.1(b) provided that all pretrial "motions shall be made no later than 20 days prior to trial, or at such other time as the court may direct." And Rule 16.1(c) provided that "[a]ny motion, defense, objection, or request not timely raised under Rule 16.1(b) shall be precluded, unless the basis thereof was not then known, and by the exercise of reasonable diligence could not then have been known, and the party raises it promptly upon learning of it." The comment to the rule indicates that Rule 16.1(c) overruled
 
 State v. Kananen
 
 ,
 
 97 Ariz. 233
 
 ,
 
 399 P.2d 426
 
 (1965), which held that "a defendant was
 
 not
 
 precluded by his failure to make a pretrial suppression motion from objecting to the admission of illegally-obtained evidence at trial." Ariz. R. Crim. P. 16.1 cmt. (2011) (emphasis added).
 

 ¶51 Bush does not argue that his failure to move to suppress his statements, request a voluntariness hearing, or object to Detective Navarro's trial testimony about Bush's confession was based on evidence that "was not then known" or that "could not then have been known" if he exercised "reasonable diligence" to discover it. Ariz. R. Crim. P. 16.1(c) (2011). Therefore, Bush forfeited any argument that his confession was involuntary.
 
 Cf.
 

 United States v. Wright
 
 ,
 
 215 F.3d 1020
 
 , 1026 (9th Cir. 2000) (declining to reach the merits of defendant's argument challenging the legality of his arrest "because he failed to raise the issue of his allegedly illegal arrest in a pre-trial suppression motion" in contravention of Federal Rule of Criminal Procedure 12(b)(3) and noting that Rule 12(f) provided that the "failure to bring a timely suppression motion constitute[d] a waiver of the issue").
 

 ¶52 Likewise, although Bush argues in his supplemental opening brief that the prosecutor engaged in misconduct by eliciting (and later arguing) evidence of Bush's confession through Detective Navarro's testimony, Bush did not object to that testimony or to any alleged prosecutorial misconduct in the trial court. Bush therefore forfeited his claim of prosecutorial misconduct absent fundamental error, which he fails to establish here.
 
 See
 

 State v. Montano
 
 ,
 
 204 Ariz. 413
 
 , 427 ¶ 70 n.6,
 
 65 P.3d 61
 
 , 75 (2003).
 

 2. Bush's Right to a Voluntariness Hearing
 

 ¶53 In a related argument, Bush contends the trial court erred in failing to sua sponte conduct a hearing to determine whether his confession was voluntary. We disagree.
 

 ¶54 A defendant "objecting to the admission of a confession" has a constitutional right grounded in the Fourteenth Amendment's Due Process Clause "to a fair hearing in which both the underlying factual issues and the voluntariness of his confession are actually and reliably determined."
 
 Jackson v. Denno
 
 ,
 
 378 U.S. 368
 
 , 380,
 
 84 S.Ct. 1774
 
 ,
 
 12 L.Ed.2d 908
 
 (1964). But the United States Constitution "does not require a voluntariness hearing absent some contemporaneous challenge to the use of the confession."
 
 Wainwright v. Sykes
 
 ,
 
 433 U.S. 72
 
 , 86,
 
 97 S.Ct. 2497
 
 ,
 
 53 L.Ed.2d 594
 
 (1977). Because Bush did not move to suppress evidence of his statements to law enforcement, request a
 voluntariness hearing, or object to Detective Navarro's trial testimony, the trial court was not required to hold a voluntariness hearing. Bush neither presented any evidence nor argued to the jury that his confession was involuntary. Nonetheless, for reasons that are unclear, the trial court (without objection) instructed the jury in the guilt phase to "not consider any statements made by the defendant to a law enforcement officer" unless the jurors "determine beyond a reasonable doubt that the defendant made the statements voluntarily."
 

 ¶55 In
 
 Jackson
 
 , the United States Supreme Court concluded that the defendant in that case had a due process right to a voluntariness hearing.
 
 378 U.S. at 391
 
 ,
 
 84 S.Ct. 1774
 
 . The Court reasoned that, although defense counsel "did not specifically object to the admission of the confession initially, the trial court indicated [during trial] its awareness that [defense] counsel was questioning the circumstances under which [the defendant] was interrogated."
 

 Id.
 

 at 374
 
 ,
 
 84 S.Ct. 1774
 
 . Later, in
 
 Wainwright
 
 , the Court stated that a defendant does not have a right "to a hearing as to the voluntariness of a confession" when he "does not object to its admission."
 
 433 U.S. at 86
 
 ,
 
 97 S.Ct. 2497
 
 . The Court explained that "the [
 
 Jackson
 
 ] defendant's objection to the use of his confession was brought to the attention of the trial court" and nothing in that "opinion suggests that a hearing would have been required even if it had not been."
 

 Id.
 

 ;
 
 see also
 

 State v. Alvarado
 
 ,
 
 121 Ariz. 485
 
 , 487 n.2,
 
 591 P.2d 973
 
 , 975 (1979) (stating that in
 
 Jackson
 
 the defendant "never specifically objected that his confession was involuntary," but that
 
 Wainwright
 
 "interprets the [
 
 Jackson
 
 ] defendant's line of questioning ... as having been the functional equivalent of an objection").
 

 ¶56 Bush argues that the trial court violated his due process right to a voluntariness hearing because in a pretrial motion to continue he raised a "general challenge," consistent with
 
 Jackson
 
 , about the voluntariness of his confession. We disagree.
 

 ¶57 In his motion to continue, Bush requested additional time to undergo psychological testing and to investigate evidence that he might present for mitigation purposes. Bush vaguely stated in the motion that he had "serious question[s]" "in his own mind" about whether he "did" confess or "intended" to confess. This unclear, isolated statement in a single pretrial motion unrelated to voluntariness is plainly not a "contemporaneous challenge to the use of the confession,"
 
 Wainwright
 
 ,
 
 433 U.S. at 86
 
 ,
 
 97 S.Ct. 2497
 
 , or a "functional equivalent of an objection,"
 
 Alvarado
 
 , 121 Ariz. at 487 n.2,
 
 591 P.2d at 975
 
 . Accordingly, the trial court did not violate Bush's due process rights by not holding a voluntariness hearing sua sponte.
 

 ¶58 Bush relatedly asserts that the trial court violated Arizona law "by failing, sua sponte, to conduct a voluntariness hearing before submitting evidence of Bush's confession to the jury." Again, we disagree.
 

 ¶59 In a line of post-
 
 Jackson
 
 but pre-
 
 Wainwright
 
 cases, this Court variously stated that a trial court must hold a voluntariness hearing if a defendant objects to the use of a confession
 
 or
 
 when the evidence raises a question about the voluntariness of a confession.
 
 See
 

 State v. Finn
 
 ,
 
 111 Ariz. 271
 
 , 275,
 
 528 P.2d 615
 
 , 619 (1974) (stating that a trial court is not required to order a voluntariness hearing sua sponte when "the question of voluntariness is not raised either by the evidence or the defense counsel");
 
 State v. Armstrong
 
 ,
 
 103 Ariz. 280
 
 , 281,
 
 440 P.2d 307
 
 , 308 (1968) (stating that "[i]t is the duty of a trial court to hold a hearing as to voluntariness of a statement or confession, if a question as to its voluntariness is raised-either by the attorneys, or one is presented by the evidence" (quoting
 
 State v. Goodyear
 
 ,
 
 100 Ariz. 244
 
 , 248,
 
 413 P.2d 566
 
 (1966) ) );
 
 State v. Simoneau
 
 ,
 
 98 Ariz. 2
 
 , 7,
 
 401 P.2d 404
 
 (1965) (stating that "where no question is presented to the court either by counsel or by the evidence at the trial suggesting that a confession is involuntary, there is no issue of fact to be determined by the court in the absence of the jury and no need for a specific ruling" and noting that even a "slight suggestion" arising from the evidence "is sufficient to raise an issue").
 

 ¶60 Although none of these cases clearly identifies the source of the supposed duty when a question of voluntariness is "presented by the evidence" and not by the defendant,
 
 Armstrong
 
 ,
 
 103 Ariz. at 281
 
 ,
 
 440 P.2d at 308
 
 , at least two of the cases-
 
 Armstrong
 
 and
 
 Simoneau
 
 -imply that the source of this rule is the Fourteenth Amendment's Due Process Clause,
 
 see
 
 id.
 

 (noting immediately before announcing the rule that this rule arose "[a]fter the opinion" in
 
 Jackson
 
 );
 
 Simoneau
 
 ,
 
 98 Ariz. at 6
 
 ,
 
 401 P.2d 404
 
 (citing
 
 Jackson
 
 in the same paragraph as the rule and also citing
 
 State v. Owen
 
 ,
 
 96 Ariz. 274
 
 ,
 
 394 P.2d 206
 
 (1964), the first case in which we interpreted
 
 Jackson
 
 ).
 

 ¶61 As noted above, however, the Supreme Court in
 
 Wainwright
 
 clarified the
 
 Jackson
 
 rule and rejected the interpretation of
 
 Jackson
 
 that we applied in this older line of cases. Indeed, after
 
 Wainwright
 
 we concluded in
 
 Alvarado
 
 that "the defendant ... must move for a voluntariness hearing." 121 Ariz. at 487,
 
 591 P.2d at 975
 
 . But we did not address, reference, or otherwise evaluate the continuing validity of our pre-
 
 Wainwright
 
 cases. Therefore, we now disavow any statements in those cases that are inconsistent with
 
 Wainwright
 
 or
 
 Alvarado
 
 .
 

 ¶62 Bush does not argue that any Arizona constitutional provision or statute requires a trial court to sua sponte hold a voluntariness hearing when a question regarding the voluntariness of a defendant's confession is only arguably raised by the evidence. Bush cites A.R.S. § 13-3988(A) in passing, but that statute does not support his argument. Section 13-3988(A) provides that before a "confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any
 
 issue
 
 as to voluntariness." (emphasis added). We interpret this statute to mean that, consistent with
 
 Wainwright
 
 and
 
 Alvarado
 
 , a trial court must address the issue of voluntariness if a defendant raises it. Our interpretation of Supreme Court precedent, our previous opinions that analyze this issue, and § 13-3988(A) harmonize a defendant's due process rights with the procedural requirements necessary to effectuate those rights. Simply put, § 13-3988(A) does not create a substantive right to a sua sponte voluntariness hearing when a question as to voluntariness is merely raised by the evidence. (On the other hand, if a trial court is aware of facts indicating that a confession was involuntary, the court, in its discretion and even absent a request, may order a voluntariness hearing.) Therefore, on this record, we reject Bush's argument that Arizona law required the trial court to sua sponte conduct a voluntariness hearing.
 

 D. Alleged
 
 Simmons
 
 Error
 

 ¶63 Bush contends the trial court committed error under
 
 Simmons v. South Carolina
 
 ,
 
 512 U.S. 154
 
 ,
 
 114 S.Ct. 2187
 
 ,
 
 129 L.Ed.2d 133
 
 (1994), by failing to inform the jury that he would not be eligible for release if sentenced to life imprisonment. Bush further contends that
 
 Simmons
 
 error is structural and requires automatic reversal or, alternatively, that the error in this case was not harmless. The State counters that fundamental error review applies, noting that Bush failed to object below to any alleged
 
 Simmons
 
 error arising from the trial court's jury instructions.
 

 ¶64 Right before jury selection began, Bush belatedly objected to a statement in the juror questionnaire that referred to a life sentence with the possibility of release after twenty-five, rather than thirty-five, years. In the ensuing discussion, Bush stated without elaboration that he did "not agree the jury should be even advised as to the possibility of release," and assured the trial court he would follow up on that point later. He never did. The trial court, after denying Bush's oral motion for a mistrial on a different ground, and without objection, instructed the first pool of prospective jurors that if they were to find the defendant guilty, find one or more aggravating circumstances, but nonetheless "unanimously agree[ ] that ... life in prison is the appropriate sentence, the Court will sentence the defendant to either life imprisonment without the possibility of release or life without the possibility of release until at least 35 calendar years have been passed [sic]." The court repeated that same incorrect instruction the next day, again without objection, before a different panel of prospective jurors. The voir dire process then began, the petit jurors were selected, and the jury found Bush guilty on all charges.
 

 ¶65 At the beginning of the aggravation phase nine days later, the trial court instructed
 the jury about possible sentences Bush faced if the jurors found one or more aggravating circumstances. The court explained that if the jury returned a life sentence, "then the judge will sentence [Bush] to either life imprisonment without the possibility of release or life imprisonment with the possibility of release after 35 years." "Life without possibility of release from prison," the court stated, "means ... [Bush] would never be eligible to be released from prison for any reason for the rest of his life." Although Bush objected to this instruction, he did so only to "the order in which [the potential sentences] are put."
 

 ¶66 Unless
 
 Simmons
 
 error is structural, Bush's failure to object on
 
 Simmons
 
 grounds at trial limits our review to fundamental error.
 
 State v. Valverde
 
 ,
 
 220 Ariz. 582
 
 , 584-85 ¶¶ 9-12,
 
 208 P.3d 233
 
 , 235-36 (2009). Bush contends that
 
 Simmons
 
 error is structural because it "undermine[s] confidence in the ... outcome of the proceeding." But the "relatively few instances in which we ... regard error as structural" all involve errors that "deprive defendants of 'basic protections' " and infect " 'the entire trial process' from beginning to end," and include "errors such as a biased trial judge [and the] complete denial of criminal defense counsel."
 
 State v. Ring
 
 (
 
 Ring III
 
 ),
 
 204 Ariz. 534
 
 , 552-53 ¶¶ 45-46,
 
 65 P.3d 915
 
 , 933-34 (2003) (quoting
 
 Neder v. United States
 
 ,
 
 527 U.S. 1
 
 , 8,
 
 119 S.Ct. 1827
 
 ,
 
 144 L.Ed.2d 35
 
 (1999) );
 
 cf.
 

 McCoy v. Louisiana
 
 , --- U.S. ----,
 
 138 S.Ct. 1500
 
 , 1511,
 
 200 L.Ed.2d 821
 
 (2018) ("Structural error 'affect[s] the framework within which the trial proceeds,' as distinguished from a lapse or flaw that is 'simply an error in the trial process itself.' " (alteration in original) (quoting
 
 Arizona v. Fulminante
 
 ,
 
 499 U.S. 279
 
 , 310,
 
 111 S.Ct. 1246
 
 ,
 
 113 L.Ed.2d 302
 
 (1991) ) ).
 

 ¶67
 
 Simmons
 
 error, in contrast, occurs only "whenever future dangerousness is at issue in a capital
 
 sentencing
 
 proceeding,"
 
 Shafer v. South Carolina
 
 ,
 
 532 U.S. 36
 
 , 51,
 
 121 S.Ct. 1263
 
 ,
 
 149 L.Ed.2d 178
 
 (2001) (emphasis added), and neither "deprive[s] defendants of 'basic protections' " nor infects " 'the entire trial process' from beginning to end,"
 
 see
 

 Ring III
 
 , 204 Ariz. at 552-53 ¶¶ 45-46,
 
 65 P.3d at 933-34
 
 (quoting
 
 Neder
 
 ,
 
 527 U.S. at 8
 
 ,
 
 119 S.Ct. 1827
 
 );
 
 cf.
 

 O'Dell v. Netherland
 
 ,
 
 521 U.S. 151
 
 , 167,
 
 117 S.Ct. 1969
 
 ,
 
 138 L.Ed.2d 351
 
 (1997) (describing
 
 Simmons
 
 as a "narrow right of rebuttal" available "in a limited class of capital cases" and rejecting argument that
 
 Simmons
 
 embodied a "watershed rule[ ] of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding" (internal quotation marks and citations omitted)). In addition, "harmless-error analysis when errors have occurred in a capital sentencing proceeding ... [is] constitutionally permissible."
 
 Clemons v. Mississippi
 
 ,
 
 494 U.S. 738
 
 , 754,
 
 110 S.Ct. 1441
 
 ,
 
 108 L.Ed.2d 725
 
 (1990). That some courts have reviewed alleged
 
 Simmons
 
 error for harmlessness further undermines Bush's claim that such error is structural.
 
 See, e.g.
 
 ,
 
 Richmond v. Polk
 
 ,
 
 375 F.3d 309
 
 , 334-36 (4th Cir. 2004) ;
 
 State v. Loftin
 
 ,
 
 146 N.J. 295
 
 ,
 
 680 A.2d 677
 
 , 715 (1996). We therefore hold that
 
 Simmons
 
 error is not structural.
 

 ¶68 Accordingly, we review Bush's
 
 Simmons
 
 claim for fundamental error.
 
 See
 

 State v. Hargrave
 
 ,
 
 225 Ariz. 1
 
 , 14 ¶¶ 50-51,
 
 234 P.3d 569
 
 , 582 (2010) (reviewing defendant's
 
 Simmons
 
 argument for fundamental error when he failed to object to trial court's possibility-of-release instruction).
 

 To establish fundamental error, a defendant must show that (1) an error occurred; (2) the error goes "to the foundation of the case, ... takes from the defendant a right essential to his defense, [or is] of such magnitude that the defendant could not possibly have received a fair trial"; and (3) the error prejudiced the defendant.
 

 Naranjo
 
 ,
 
 234 Ariz. at
 
 246 ¶ 58,
 
 321 P.3d at 411
 
 (alteration in original) (quoting
 
 Henderson
 
 ,
 
 210 Ariz. at
 
 567 ¶¶ 19-20,
 
 115 P.3d at
 
 607 ). We first address whether Bush has met his burden to establish that
 
 Simmons
 
 error occurred.
 

 Id.
 

 ;
 
 see also
 

 Henderson
 
 ,
 
 210 Ariz. at
 
 568 ¶ 23,
 
 115 P.3d at 608
 
 ("To obtain relief under the fundamental error standard of review, [the defendant] must first prove error.").
 

 ¶69 Under
 
 Simmons
 
 and its progeny, including
 
 Lynch v. Arizona
 
 (
 
 Lynch II
 
 ), --- U.S. ----,
 
 136 S.Ct. 1818
 
 ,
 
 195 L.Ed.2d 99
 
 (2016), when a parole-ineligible defendant's
 "future dangerousness [is] at issue," due process entitles him to "inform the jury of his parole ineligibility."
 
 Simmons
 
 ,
 
 512 U.S. at 171
 
 ,
 
 114 S.Ct. 2187
 
 (plurality opinion). Bush argues that the trial court's possibility-of-release instruction falls squarely within
 
 Simmons
 
 and violates his due process rights because "the correct information regarding [his] parole ineligibility [was] withheld from the jury," and "the jurors were repeatedly told that [he] was in fact eligible for release."
 

 ¶70 Although the trial court's jury instruction referring to the possibility of release conformed to this Court's prior and then-applicable case law,
 
 see, e.g.
 
 ,
 
 Hargrave
 
 ,
 
 225 Ariz. at
 
 14-15 ¶¶ 50-53,
 
 234 P.3d at 582-83
 
 , the instruction apparently was incorrect under the Supreme Court's subsequent opinion in
 
 Lynch II
 
 ,
 
 136 S.Ct. at 1818-20
 
 (reversing
 
 State v. Lynch
 
 ,
 
 238 Ariz. 84
 
 , 103 ¶ 65,
 
 357 P.3d 119
 
 (2015), which found no
 
 Simmons
 
 error when trial court "properly instructed the jury" that court "could impose a release-eligible sentence if the jury did not return a death verdict"). Nonetheless, we disagree with Bush's assertion that fundamental
 
 Simmons
 
 error occurred.
 

 ¶71 Bush urges us to adopt a broader interpretation of
 
 Simmons
 
 than the United States Supreme Court itself applies. In
 
 Simmons
 
 , four Justices joined the Court's plurality holding that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible."
 
 512 U.S. at 156
 
 ,
 
 114 S.Ct. 2187
 
 (plurality opinion). The plurality explained that "due process plainly requires that [the defendant] be allowed to bring [his parole ineligibility] to the jury's attention by way of argument by defense counsel or an instruction from the court" in order to " 'deny or explain' the [state's] showing of future dangerousness."
 

 Id.
 

 at 169
 
 ,
 
 114 S.Ct. 2187
 
 (quoting
 
 Gardner v. Florida
 
 ,
 
 430 U.S. 349
 
 , 362,
 
 97 S.Ct. 1197
 
 ,
 
 51 L.Ed.2d 393
 
 (1977) );
 
 see also
 

 O'Dell
 
 ,
 
 521 U.S. at 159
 
 ,
 
 117 S.Ct. 1969
 
 (noting that in
 
 Simmons
 
 "there was no opinion for the Court" and that four Justices merely "concluded that the Due Process Clause required allowing the defendant to inform the jury-through argument or instruction-of his parole ineligibility in the face of a prosecution's future dangerousness argument").
 

 ¶72 Justice Ginsburg (who joined the Court's plurality opinion) wrote a separate concurrence, as did Justice O'Connor (who did not join the plurality but separately concurred in the judgment, with Chief Justice Rehnquist and Justice Kennedy joining her opinion). Justice Ginsburg's separate opinion in
 
 Simmons
 
 clarified that, in her view, "due process does not dictate that the judge herself, rather than defense counsel, provide the [parole ineligibility] instruction."
 
 512 U.S. at 174
 
 ,
 
 114 S.Ct. 2187
 
 (Ginsburg, J., concurring). Justice O'Connor further clarified that when the prosecution seeks to show a parole-ineligible defendant's future dangerousness, "the defendant should be allowed to bring his parole ineligibility to the jury's attention-by way of argument by defense counsel or an instruction from the court-as a means of responding to the State's showing of future dangerousness."
 

 Id.
 

 at 177
 
 ,
 
 114 S.Ct. 2187
 
 (O'Connor, J., concurring in the judgment). Under those circumstances, Justice O'Connor stated, "due process entitles the defendant to inform the capital sentencing jury-by either argument or instruction-that he is parole ineligible."
 

 Id.
 

 at 178
 
 ,
 
 114 S.Ct. 2187
 
 .
 

 ¶73 Justice O'Connor's opinion represents "the narrowest ground[ ]" that "may be viewed as [the] position taken by" the Court on the issue of what due process requires in this context.
 
 Marks v. United States
 
 ,
 
 430 U.S. 188
 
 , 193,
 
 97 S.Ct. 990
 
 ,
 
 51 L.Ed.2d 260
 
 (1977) (internal quotation marks omitted) (quoting
 
 Gregg v. Georgia
 
 ,
 
 428 U.S. 153
 
 , 169 n.15,
 
 96 S.Ct. 2909
 
 ,
 
 49 L.Ed.2d 859
 
 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) );
 
 State v. Medina
 
 ,
 
 232 Ariz. 391
 
 , 406 ¶ 57,
 
 306 P.3d 48
 
 (2013). Thus, the due process right under
 
 Simmons
 
 merely affords a parole-ineligible capital defendant the right to "rebut the State's case" (if future dangerousness is at issue) by informing the jury that "he will never be released from prison" if sentenced to life.
 
 Simmons
 
 ,
 
 512 U.S. at 177
 
 ,
 
 114 S.Ct. 2187
 
 (O'Connor, J., concurring in the judgment).
 

 ¶74 The Supreme Court's subsequent cases, other federal decisions, and this
 Court's opinions support that narrow interpretation of
 
 Simmons
 
 .
 
 See, e.g.
 
 ,
 
 Lynch II
 
 ,
 
 136 S.Ct. at 1818
 
 (describing
 
 Simmons
 
 as entitling the defendant to inform the jury, through instruction or argument, of his parole ineligibility);
 
 O'Dell
 
 ,
 
 521 U.S. at 167
 
 ,
 
 117 S.Ct. 1969
 
 (describing
 
 Simmons
 
 as providing a "narrow right of rebuttal");
 
 Townes v. Murray
 
 ,
 
 68 F.3d 840
 
 , 850 (4th Cir. 1995) ("[T]he defendant's right, under
 
 Simmons
 
 , is one of opportunity, not of result.");
 
 State v. Hulsey
 
 ,
 
 243 Ariz. 367
 
 , 396 ¶ 138,
 
 408 P.3d 408
 
 , 437 (2018) (same);
 
 cf.
 

 State v. Escalante-Orozco
 
 ,
 
 241 Ariz. 254
 
 , 285 ¶ 118,
 
 386 P.3d 798
 
 (2017) (suggesting that
 
 Simmons
 
 error is waivable). Furthermore, in every case in which the Supreme Court or this Court has found reversible
 
 Simmons
 
 error, the trial court either rejected the defendant's proposed jury instruction regarding his ineligibility for parole, prevented defense counsel "from saying anything to the jury about parole ineligibility," or both.
 
 Simmons
 
 ,
 
 512 U.S. at 175
 
 ,
 
 114 S.Ct. 2187
 
 (Ginsburg, J., concurring);
 
 accord, e.g.
 
 ,
 
 Lynch II
 
 ,
 
 136 S.Ct. at 1819
 
 (both);
 
 Kelly v. South Carolina
 
 ,
 
 534 U.S. 246
 
 , 249,
 
 122 S.Ct. 726
 
 ,
 
 151 L.Ed.2d 670
 
 (2002) (refusal to inform);
 
 Shafer
 
 ,
 
 532 U.S. at 41-46
 
 ,
 
 121 S.Ct. 1263
 
 (both);
 
 Hulsey
 
 ,
 
 243 Ariz. at
 
 394 ¶¶ 124-27,
 
 408 P.3d at 435
 
 (both);
 
 State v. Rushing
 
 ,
 
 243 Ariz. 212
 
 , 221 ¶ 36,
 
 404 P.3d 240
 
 , 249 (2017) (refusal to inform);
 
 Escalante-Orozco
 
 ,
 
 241 Ariz. at
 
 284 ¶ 116,
 
 386 P.3d at 828
 
 (refusal to inform). In short,
 
 Simmons
 
 "relief is foreclosed by [the defendant]'s failure to request a parole ineligibility instruction at trial."
 
 Campbell v. Polk
 
 ,
 
 447 F.3d 270
 
 , 289 (4th Cir. 2006) ;
 
 accord
 

 Townes
 
 ,
 
 68 F.3d at 850
 
 .
 

 ¶75 Here, Bush has not shown that he was deprived of the right to inform the jury of his parole ineligibility. Unlike in the aforementioned cases, the trial court neither refused to instruct, nor prevented Bush from informing, the jury regarding his parole ineligibility. To the extent defense counsel briefly and vaguely voiced disagreement before jury selection over whether jurors should "be advised as to the possibility of release," and despite stating he would "talk more about that" disagreement "in a second," he failed to do so that day or at any time during trial. Thus, Bush has not established
 
 Simmons
 
 error. Accordingly, we do not address whether future dangerousness, a prerequisite to finding reversible
 
 Simmons
 
 error, was at issue in this case,
 
 Lynch II
 
 ,
 
 136 S.Ct. at 1818
 
 ;
 
 Simmons
 
 ,
 
 512 U.S. at 156
 
 ,
 
 114 S.Ct. 2187
 
 (plurality opinion);
 
 Simmons
 
 ,
 
 512 U.S. at 177-78
 
 ,
 
 114 S.Ct. 2187
 
 (O'Connor, J., concurring in the judgment), nor do we address whether Bush has carried his burden of establishing prejudice resulting from any alleged
 
 Simmons
 
 error.
 
 See
 

 Henderson
 
 ,
 
 210 Ariz. at
 
 567 ¶ 20, 568-69 ¶¶ 26-28,
 
 115 P.3d at 607, 608-09
 
 .
 

 E. Victim-Impact Evidence
 

 ¶76 Bush contends the trial court abused its discretion by allowing Gina, the surviving victim, to make an impact statement allegedly containing impermissible characterizations and opinions about Bush and the murders, which he claims served no purpose other than to inflame the jury and inject non-statutory aggravation evidence into the proceedings. Bush further argues that the victim-impact evidence violated his Fifth Amendment privilege against self-incrimination and amounted to prosecutorial misconduct.
 

 ¶77 After the aggravation phase and before Bush presented his mitigation evidence, Gina read a prepared statement describing the impact of her husband's and daughter's murders as the prosecution displayed seven portrait-type photographs of Brisenia. The State noted that these were the "same photographs that Ms. Gonzales used" in Forde's trial, and the trial court informed the jury that Gina would not be under oath and that hers "is a statement of the victim ... not subject to cross examination."
 

 ¶78 Gina's impact statement largely described the two murders from her perspective, her and her surviving daughter's struggles to understand and cope with losing her husband and daughter, and those victims' individual characteristics. Gina did, however, state that her "daughter was shot at close range, like she was worth nothing," and "[c]lose enough to almost blow her face completely off." She also stated that Bush "lied" to Brisenia and "knew what his intentions
 were," and expressed confusion about "how someone could have that much hate in their heart."
 

 ¶79 Bush did not object until several days after Gina gave her statement, when he submitted limiting instructions and moved for a mistrial. He alleged the statement violated
 
 Payne v. Tennessee
 
 ,
 
 501 U.S. 808
 
 ,
 
 111 S.Ct. 2597
 
 ,
 
 115 L.Ed.2d 720
 
 (1991), and
 
 Booth v. Maryland
 
 ,
 
 482 U.S. 496
 
 ,
 
 107 S.Ct. 2529
 
 ,
 
 96 L.Ed.2d 440
 
 (1987), because it was "clearly directed toward the defendant" and did not "deal[ ] with the victim." The trial court denied Bush's motion for a mistrial but agreed to give a "cautionary instruction" directing jurors to consider Gina's statement only "as it relates to the personal characteristics and uniqueness of the victims and the impact of their deaths on the victims' family," and to disregard any portion "that may relate to her opinion of the crime or [Bush]."
 

 ¶80 We review the denial of a motion for a mistrial for abuse of discretion.
 
 Burns
 
 ,
 
 237 Ariz. at
 
 29 ¶ 136,
 
 344 P.3d at 331
 
 . A victim has the right "[t]o be heard at any proceeding involving ... sentencing." Ariz. Const. art. 2, § 2.1 (4). Impact statements provide "evidence about the victim and ... the impact of the murder on the victim's family,"
 
 Payne
 
 ,
 
 501 U.S. at 827
 
 ,
 
 111 S.Ct. 2597
 
 , help inform the jury about the "specific harm caused by the crime in question,"
 

 id.
 

 at 825
 
 ,
 
 111 S.Ct. 2597
 
 , and rebut mitigation evidence "by reminding the [jury] that ... the victim is an individual whose death represents a unique loss to society and ... to his family,"
 

 id.
 

 (internal quotation marks omitted) (quoting
 
 Booth
 
 ,
 
 482 U.S. at 517
 
 ,
 
 107 S.Ct. 2529
 
 (White, J., dissenting) ).
 

 ¶81 Victim-impact evidence is subject to constitutional limitations. The Eighth Amendment, for example, prohibits victim-impact statements from containing "victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence."
 

 Id.
 

 at 830 n.2,
 
 111 S.Ct. 2597
 
 ;
 
 accord
 

 Booth
 
 ,
 
 482 U.S. at 508
 
 ,
 
 107 S.Ct. 2529
 
 . Likewise, due process principles prohibit impact evidence that "is 'so unduly prejudicial that it renders the trial fundamentally unfair.' "
 
 State v. Dann
 
 ,
 
 220 Ariz. 351
 
 , 369 ¶ 98,
 
 207 P.3d 604
 
 , 622 (2009) (quoting
 
 Payne
 
 ,
 
 501 U.S. at 825
 
 ,
 
 111 S.Ct. 2597
 
 ).
 

 ¶82 We cannot say Gina's statements were unduly prejudicial. She did not advocate for the death penalty,
 
 see
 

 State v. Carlson
 
 ,
 
 237 Ariz. 381
 
 , 397 ¶¶ 59-61,
 
 351 P.3d 1079
 
 , 1095 (2015), and her statements are no more problematic than others this Court has found permissible,
 
 see, e.g.
 
 ,
 
 Burns
 
 , 237 Ariz. at 30 ¶ 141,
 
 344 P.3d at 332
 
 (describing victim's final moments was "not unduly prejudicial");
 
 State v. Rose
 
 ,
 
 231 Ariz. 500
 
 , 513 ¶ 57,
 
 297 P.3d 906
 
 , 919 (2013) (finding "cop killer" a permissible statement);
 
 State v. Cota
 
 ,
 
 229 Ariz. 136
 
 , 150 ¶¶ 69-72,
 
 272 P.3d 1027
 
 , 1041 (2012) (describing the victims' bodies as "mutilated" and "tortured" permissible). Moreover, we concluded in
 
 Forde
 
 that Gina's similar statement in that case appropriately conveyed her inability to comprehend the killings.
 
 233 Ariz. at
 
 570 ¶¶ 113-14,
 
 315 P.3d at 1227
 
 .
 

 ¶83 We also reject Bush's challenge to a photo presentation that pales in comparison to the 123-photograph presentation we upheld in
 
 Burns
 
 , based partially on a limiting instruction like the one given here. 237 Ariz. at 29-30 ¶¶ 137-40,
 
 344 P.3d at 331-32
 
 . In short, the trial court did not abuse its discretion in denying his motion for a mistrial.
 

 ¶84 Bush next argues that the State committed prosecutorial misconduct amounting to prejudicial fundamental error when it introduced (and later argued) Gina's statements describing how Bush bragged about the killings and retained a bullet from the crime scene as a souvenir. Because Bush failed to object to the alleged prosecutorial misconduct, our analysis is limited to fundamental error review.
 
 Cota
 
 ,
 
 229 Ariz. at
 
 151 ¶ 79,
 
 272 P.3d at 1042
 
 .
 

 ¶85 We find no evidence of prosecutorial misconduct in the record. As Bush concedes, the prosecution did not allege, and the jury was not instructed on, the relishing aggravator, and "[n]one of [Gina's] statements encouraged the jury to consider unproven aggravators."
 
 Id.
 
 ¶ 80. Furthermore, the trial court dispelled any lingering concern by instructing the jury it may not consider Gina's statement as aggravation.
 
 See
 

 id.
 
 at 150 ¶ 72,
 
 272 P.3d at 1041
 
 (upholding a similar instruction).
 

 ¶86 We likewise reject Bush's claim that the prosecution committed misconduct when it "orchestrat[ed] the victim impact presentation" that was "virtually identical" to that given in
 
 Forde
 
 , such that Gina was "not simply speaking extemporaneously." Because
 
 Forde
 
 involved the same facts as this case, Gina's impact statement was unsurprisingly similar in both cases.
 

 ¶87 Bush also contends that Gina violated his Fifth Amendment privilege against self-incrimination and Sixth Amendment Confrontation Clause rights when she "directly addressed [him] ... in open court, thereby calling for an answer." We rejected this argument in
 
 Forde
 
 ,
 
 233 Ariz. at
 
 570 ¶¶ 113-14,
 
 315 P.3d at 1227
 
 , and Bush concedes that Gina's statement in that case is "virtually identical" to the statement she made in this case.
 

 F. Double Punishment
 

 ¶88 Bush argues that the sentences for his non-capital convictions constitute impermissible double punishment. Although Bush's failure to object to his sentences in the trial court limits our analysis to fundamental error review, an illegal sentence constitutes fundamental error.
 
 Forde
 
 ,
 
 233 Ariz. at
 
 574 ¶ 137,
 
 315 P.3d at 1231
 
 .
 

 ¶89 Bush was sentenced to a total of seventy-eight years' imprisonment: twenty-one years for first degree burglary (count three); twenty-one years for attempted first degree murder (count four); fifteen years for aggravated assault (count five); fifteen years, to run concurrently with his sentence for count five, for aggravated assault with a deadly weapon (count six); twenty-one years for armed robbery with a deadly weapon (count seven); and fifteen years, to run concurrently with his sentence for count seven, for aggravated robbery while aided by one or more accomplices (count eight).
 

 ¶90 Under Arizona law, "[a]n act or omission ... made punishable in different ways by different sections of the laws may be punished under both, but in no event may sentences be other than concurrent." A.R.S. § 13-116. We apply a three-part test to determine whether a defendant's conduct constitutes a single "act or omission" under the statute.
 
 State v. Gordon
 
 ,
 
 161 Ariz. 308
 
 , 315,
 
 778 P.2d 1204
 
 , 1211 (1989). Under
 
 Gordon
 
 , we first "subtract[ ] from the factual transaction the evidence necessary to convict on the ultimate charge"-here, the murders (as to Brisenia and Junior) and attempted murder (as to Gina)-and then determine whether "the remaining evidence satisfies the elements of the other crime[s]."
 

 Id.
 

 We then determine "whether ... it was factually impossible to commit the ultimate crime without also committing the secondary crime[s]."
 

 Id.
 

 Finally, we "consider whether the defendant's conduct in committing the [secondary] crime[s] caused the victim to suffer an additional risk of harm beyond that inherent in the ultimate crime."
 

 Id.
 

 ¶91 Bush's sentences for his non-capital convictions satisfy
 
 Gordon
 
 . His conviction for burglary (count three) satisfies the identical elements test relative to, and was not a necessary component of, his murder convictions, and subjected his victims to a distinct form of harm-violation of privacy and security-different than loss of life.
 
 Compare
 
 A.R.S. § 13-1508,
 
 with
 
 § 13-1105. Bush further contends that his sentence for count three must run concurrent with his sentence for count four because the burglary did not subject Gina to an additional risk of harm beyond the attempted murder, but this claim fails for the same reason.
 

 ¶92 Bush's convictions for aggravated assault (counts five and six) also satisfy the identical elements test as they relate to his attempted murder conviction (count four). Bush nonetheless argues that his sentences for those counts must be concurrent with his attempted murder sentence because the harm inherent to aggravated assault is no different than the harm inherent to attempted murder. We rejected a similar claim in
 
 Forde
 
 , noting that the "aggravated assault convictions were established by evidence that Bush shot Gina twice and seriously injured her soon after he initially entered the home," and that the "attempted murder conviction was established by evidence that at the conclusion
 of the home invasion, Forde discovered Gina on the phone and shouted for someone to 'finish [her] off,' prompting Bush to re-enter the home and shoot at Gina."
 
 233 Ariz. at
 
 574 ¶ 138,
 
 315 P.3d at 1231
 
 (alteration in original). We also noted that the "attempted murder and aggravated assaults occurred at different times during the home invasion and involved separate acts," such that "it was possible ... to commit the former crime without committing the latter ones."
 
 Id.
 
 ¶ 139. Finally, we concluded that "the aggravated assaults caused Gina to suffer physical injuries that were not inherent in the attempted murder."
 
 Id.
 
 Because the facts in this case and
 
 Forde
 
 are identical, Bush's claim necessarily fails.
 

 ¶93 Finally, Bush contends that his sentences for robbery and aggravated robbery (counts seven and eight), which run concurrently with each other, must also run concurrently with his sentence for attempted murder (count four). But these counts also satisfy the identical elements test because the elements of the relevant crimes, as with the facts underlying those crimes, are not identical. Indeed, Bush and his accomplices ransacked Gina's home after the initial shootings and before Bush returned, at Forde's command, to kill Gina. Moreover, robbery involves the unlawful taking of another's possessions, which is a harm distinct from an unjustified attempt to kill.
 
 Compare
 
 A.R.S. §§ 13-1902, -1903,
 
 with
 
 §§ 13-1001, -1105. As such, the consecutive sentences do not violate § 13-116, and the trial court did not err in sentencing Bush on these counts.
 

 G. Abuse of Discretion Review
 

 ¶94 We review the jury's imposition of a death sentence for abuse of discretion. A.R.S. § 13-756(A). Arizona law requires us to "review the sentencing portion of the trial even when a defendant fails," as Bush did here, "to challenge the jury's decision with regard to either the aggravating factors or the imposition of the death sentences."
 
 State v. Morris
 
 ,
 
 215 Ariz. 324
 
 , 340 ¶¶ 75-76,
 
 160 P.3d 203
 
 , 219 (2007) ;
 
 accord
 
 § 13-756(A). "A finding of an aggravating circumstance is not an abuse of discretion if there is 'any reasonable evidence in the record to sustain it.' "
 
 State v. Manuel
 
 ,
 
 229 Ariz. 1
 
 , 9 ¶ 42,
 
 270 P.3d 828
 
 , 836 (2011) (quoting
 
 Morris
 
 , 215 Ariz. at 341 ¶ 77,
 
 160 P.3d at
 
 220 ). Moreover, "[t]he jury's determination that death is the appropriate sentence will not be reversed 'so long as any reasonable jury could have concluded that the mitigation established by the defendant was not sufficiently substantial to call for leniency.' "
 
 Id
 
 . (quoting
 
 Morris
 
 , 215 Ariz. at 341 ¶ 81,
 
 160 P.3d at
 
 220 ).
 

 1. Aggravating Circumstances
 

 ¶95 For Brisenia's murder, the prosecution alleged, and the jury found, that Bush "was an adult at the time" he murdered Brisenia, who "was under fifteen years of age," which is an aggravating circumstance under A.R.S. § 13-751(F)(9). For both murders, the prosecution alleged, and the jury found, that Bush committed multiple homicides on the same occasion and after having been convicted of another serious offense "committed on the same occasion as the homicide[s]," which are aggravating circumstances under § 13-751(F)(2) and (8). Sufficient evidence supports the jury's finding of the aggravating circumstances.
 

 2. Mitigating Circumstances
 

 ¶96 Bush presented evidence of significant mental illness, a severely troubled past, and a "very strong" "delusional system" involving his military background. His mitigation expert, however, acknowledged that Bush likely had the capacity to "know right from wrong" and that it "was not typical for anyone to murder a nine year old girl." And to the extent that Bush offered evidence that he may have had militaristic delusions, his expert also acknowledged that Bush was candid with him about his background and never described any such delusions. Furthermore, the prosecution offered evidence that doctors in another state evaluated Bush for two weeks in 1998 and concluded that he, "although claiming mental illness, ... was not mentally ill" and "was prone to attempt[ ] to manipulate others" in order to "gain preferential treatment in prison."
 

 3. Propriety of Death Sentences
 

 ¶97 Given the aggravating circumstances and the mitigation presented, a reasonable juror could conclude that the mitigating circumstances were not sufficiently substantial to call for leniency. Accordingly, the jury did not abuse its discretion in returning death verdicts for Bush's murders of Brisenia and Junior Flores.
 

 H. Additional Issues
 

 ¶98 Stating that he wants to preserve certain "constitutional challenges to his death sentences" based on claims that "have previously been rejected by this Court or the federal courts," Bush lists nineteen claims and previous decisions rejecting them. We decline to revisit those claims.
 

 I. The Dissent
 

 ¶99 Judge Winthrop's partial dissent asserts that the death penalty currently is "both cruel and unusual" and therefore unconstitutional under article 2, section 15 of the Arizona Constitution, this state's counterpart to the Eighth Amendment's "cruel and unusual punishment" clause.
 
 Infra
 
 ¶¶ 120, 136, 149 (Winthrop, J., concurring in part and dissenting in part). We do not directly address that assertion because well-established jurisprudential and procedural principles, as well as constitutional constraints on our proper role as state court jurists under Arizona's separation of powers, prohibit us from overturning this state's capital scheme, at least in this case.
 

 ¶100 The dissent is odd on several levels. It purportedly rests on the Arizona Constitution's prohibition of cruel and unusual punishment because, as the dissent acknowledges, binding United States Supreme Court precedent has rejected Eighth Amendment challenges to the death penalty.
 
 Infra
 
 ¶¶ 120, 131. Strangely, however, the dissent disregards our state's pertinent history and case law directly bearing on article 2, section 15, and instead relies largely on Supreme Court cases-mostly dissenting and other non-majority opinions-interpreting the Eighth Amendment to support its view.
 
 See
 

 infra
 
 ¶¶ 124, 126, 129-30, 136. This approach is fruitless.
 

 ¶101 The United States Supreme Court has not suggested that Arizona's capital sentencing scheme is unconstitutional, whether in cases involving our statutes or similar statutes of other states. Indeed, the Court recently declined to directly address, invalidate, or even question this state's capital sentencing statutes.
 
 Hidalgo v. Arizona
 
 , --- U.S. ----,
 
 138 S.Ct. 1054
 
 ,
 
 200 L.Ed.2d 496
 
 (2018). To be sure, Justice Breyer has noted "a possible constitutional problem" with Arizona's statutory scheme based on its extensive list of aggravating circumstances,
 

 id.
 

 at 1057
 
 (Breyer, J., respecting the denial of certiorari), a concern the dissent apparently shares,
 
 infra
 
 ¶ 120 n.1. But Justice Breyer's previously announced view that "it [is] highly likely that the death penalty violates the Eighth Amendment" is not the view of a majority of Justices and thus is not the law.
 
 Glossip v. Gross
 
 , --- U.S. ----,
 
 135 S.Ct. 2726
 
 , 2776-77,
 
 192 L.Ed.2d 761
 
 (2015) (Breyer, J., dissenting).
 

 ¶102 As the dissent correctly notes, over forty years ago the Supreme Court "essentially reaffirm[ed] the constitutionality of the death penalty throughout the nation."
 
 Infra
 
 ¶ 131;
 
 see also
 

 Glossip
 
 ,
 
 135 S.Ct. at 2732
 
 (stating that "
 
 Gregg
 
 reaffirmed that the death penalty does not violate the Constitution" and that "it is settled that capital punishment is constitutional");
 
 Gregg
 
 ,
 
 428 U.S. at 187, 207
 
 ,
 
 96 S.Ct. 2909
 
 (joint opinion of Stewart, Powell, and Stevens, JJ.);
 
 Gregg
 
 ,
 
 428 U.S. at 207, 220-26
 
 ,
 
 96 S.Ct. 2909
 
 (White, J., concurring in the judgment). In the four decades since, the Court has not found capital punishment unconstitutional under the Eighth Amendment, whether based on "the evolving standards of decency that mark the progress of a maturing society,"
 
 infra
 
 ¶ 122 (quoting
 
 Trop v. Dulles
 
 ,
 
 356 U.S. 86
 
 , 101,
 
 78 S.Ct. 590
 
 ,
 
 2 L.Ed.2d 630
 
 (1958) (plurality opinion) ), or otherwise.
 

 ¶103 As state court judges, we of course are bound by that authority under the Supremacy Clause. U.S. Const. art. VI, cl. 2 (stating that the federal "Constitution ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby");
 
 see also
 
 Ariz. Const. art. 2, § 3 (A)
 

 (stating that "[t]he Constitution of the United States is the supreme law of the land"). We therefore cannot interpret the federal Constitution to be more restrictive than has the Supreme Court on issues that Court has directly addressed.
 
 See, e.g.
 
 ,
 
 Arkansas v. Sullivan
 
 ,
 
 532 U.S. 769
 
 , 772,
 
 121 S.Ct. 1876
 
 ,
 
 149 L.Ed.2d 994
 
 (2001) (rejecting a state court's holding that "it may interpret the United States Constitution to provide greater protection than [the] Court's own federal constitutional precedents provide");
 
 accord
 

 Oregon v. Hass
 
 ,
 
 420 U.S. 714
 
 , 719,
 
 95 S.Ct. 1215
 
 ,
 
 43 L.Ed.2d 570
 
 (1975). Nor may we anticipate or assume that the Supreme Court will overturn or alter its established precedent.
 
 See
 

 Hohn v. United States
 
 ,
 
 524 U.S. 236
 
 , 252-53,
 
 118 S.Ct. 1969
 
 ,
 
 141 L.Ed.2d 242
 
 (1998) (stating that the Court's "decisions remain binding precedent" until the Court "see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality");
 
 State Oil Co. v. Khan
 
 ,
 
 522 U.S. 3
 
 , 20,
 
 118 S.Ct. 275
 
 ,
 
 139 L.Ed.2d 199
 
 (1997) (stating that it is the "Court's prerogative alone to overrule one of its precedents"). Thus, the dissent rightly acknowledges that this Court has no basis to declare Arizona's capital scheme invalid under the United States Constitution.
 
 Infra
 
 ¶ 120.
 

 ¶104 The dissent ostensibly relies on article 2, section 15 of the Arizona Constitution to support its view, but for several reasons that reliance is misplaced here. First and foremost, that issue is not properly before us as Bush did not raise it in the trial court or here on appeal. We generally do not address issues not properly raised, developed, and argued by the parties (and certainly would not do so here but for the dissent).
 
 See
 

 State v. McCall
 
 ,
 
 139 Ariz. 147
 
 , 163,
 
 677 P.2d 920
 
 , 936 (1983) (stating in a capital case that "[f]ailure to argue a claim constitutes abandonment");
 
 see also
 
 Ariz. R. Crim. P. 31.10(a)(7)(A) (requiring appellant's brief to contain specific contentions with supporting reasons, legal authorities, and record references);
 
 State ex rel. Brnovich v. City of Tucson
 
 ,
 
 242 Ariz. 588
 
 , 599 ¶ 45,
 
 399 P.3d 663
 
 , 674 (2017) ("We generally do not reach out to decide important constitutional issues or to upset established precedent when no party has raised or argued such issues.").
 

 ¶105 The dissent is flawed in other respects as well. This Court of course may independently interpret and apply provisions of the Arizona Constitution in a manner that affords greater protection to individual rights than their federal counterparts.
 
 See, e.g.
 
 ,
 
 City of Mesquite v. Aladdin's Castle, Inc.
 
 ,
 
 455 U.S. 283
 
 , 293,
 
 102 S.Ct. 1070
 
 ,
 
 71 L.Ed.2d 152
 
 (1982) (citing William J. Brennan, Jr.,
 
 State Constitutions and the Protection of Individual Rights
 
 ,
 
 90 Harv. L. Rev. 489
 
 (1977) ). But any such analysis must be anchored in the text, history, and considered interpretation of the state constitutional provision in question. The dissent is untethered to any of those pertinent factors, leaving it adrift and unrestrained.
 

 ¶106 To date, this Court has not interpreted article 2, section 15 differently than the Eighth Amendment. The language of both provisions is virtually identical, both prohibiting infliction of "cruel and unusual punishment" (the Eighth Amendment uses the plural, "punishments"). We "do not follow federal precedent blindly" in interpreting our state's constitution, but up to this point we have found no "compelling reason to interpret Arizona's cruel and unusual punishment provision differently from the related provision in the federal constitution."
 
 State v. Davis
 
 ,
 
 206 Ariz. 377
 
 , 380-81 ¶ 12,
 
 79 P.3d 64
 
 , 67-68 (2003). Accordingly, "[w]e ordinarily interpret the scope of a clause in the Arizona Constitution similarly to the United States Supreme Court's interpretation of an identical clause in the federal constitution," particularly when "this court has consistently followed federal precedent in [the] area."
 
 State v. Noble
 
 ,
 
 171 Ariz. 171
 
 , 173,
 
 829 P.2d 1217
 
 , 1219 (1992).
 

 ¶107 Such consistency is found in this Court's article 2, section 15 jurisprudence regarding capital punishment.
 
 See
 

 State v. Jackson
 
 ,
 
 186 Ariz. 20
 
 , 25,
 
 918 P.2d 1038
 
 , 1043 (1996) (rejecting challenge to death penalty under article 2, section 15 and ascribing to it "the same meaning" as Eighth Amendment "where the parties do not argue otherwise");
 
 State v. Endreson
 
 ,
 
 108 Ariz. 366
 
 , 370,
 
 498 P.2d 454
 
 , 458 (1972) (same, and stating: "Unless and until the United States Supreme
 Court orders us to do otherwise, or until the Arizona legislature sees fit to abolish the use of the death penalty in this State, we will continue to uphold its constitutionality and affirm its imposition when, because of aggravating circumstances, it is warranted.");
 
 State v. Maloney
 
 ,
 
 105 Ariz. 348
 
 , 358-60,
 
 464 P.2d 793
 
 , 803-05 (1970) (upholding capital punishment under article 2, section 15 while recognizing that societal status of that penalty was "in turmoil," with "a plethora of arguments pro and con on the question");
 
 State v. Boggs
 
 ,
 
 103 Ariz. 328
 
 , 334-35,
 
 441 P.2d 778
 
 , 784-85 (1968) (holding that Arizona's death penalty does not violate article 2, section 15 ). The dissent's reliance on article 2, section 15 thus finds no support in our case law.
 

 ¶108 Adopting the dissent's position would require overruling that longstanding Arizona precedent, apparently because it is deemed obsolete as being out of step with "the evolving standards of decency" in our "maturing society,"
 
 infra
 
 ¶ 122 (quoting
 
 Trop
 
 ,
 
 356 U.S. at 101
 
 ,
 
 78 S.Ct. 590
 
 (plurality opinion) ), a notion this Court has not yet expressly embraced as a matter of state constitutional law.
 
 Cf.
 

 Glossip
 
 ,
 
 135 S.Ct. at 2749
 
 (Scalia, J., concurring) (attempting "to divine 'the evolving standards of decency that mark the progress of a maturing society' " is "a task for which [judges] are eminently ill suited" (quoting
 
 Trop
 
 ,
 
 356 U.S. at 101
 
 ,
 
 78 S.Ct. 590
 
 (plurality opinion) ) ). But even if we assume that the Eighth Amendment standard applies for purposes of article 2, section 15, neither Bush nor the dissent urges us to overrule any prior Arizona case.
 

 ¶109 Nor does the history of Arizona's provision seem to support the dissent. When our state's constitution, including article 2, section 15, was approved and adopted in 1912, Arizona law authorized capital punishment.
 
 See generally
 
 John D. Leshy,
 
 The Arizona State Constitution
 
 , at 79 n.24 (2d ed. 2013); C. McClennen,
 
 Capital Punishment in Arizona
 
 , Ariz. Attorney 17-21 (Oct. 1992). (Arizona voters abolished the death penalty in 1916 but then quickly repealed the prohibition in 1918.) At the constitutional convention, one delegate's proposal to ban capital punishment never reached the floor. Leshy,
 
 supra
 
 , at 79. And "another delegate successfully insisted on changing the conjunction between cruel and unusual from 'or' to 'and' to prevent the Arizona courts from outlawing new methods of execution, such as electrocution, on the grounds that they were simply unusual rather than cruel."
 
 Id.
 
 In addition, later amendments to the constitution explicitly refer to the death penalty, arguably "negating any inference that capital punishment is per se cruel and unusual in violation of [ article 2, section 15 ]."
 
 Id.
 
 ;
 
 see also
 
 Ariz. Const. art. 2, § 23 (1972) (trial by jury and number of jurors); Ariz. Const. art. 22, § 22 (1992) (methods of execution on judgments of death).
 

 ¶110 In sum, the dissent's resort to article 2, section 15 to support its view that Arizona's death penalty is unconstitutionally "cruel and unusual" is difficult to reconcile with the relevant text, history, and caselaw.
 
 Cf.
 

 Glossip
 
 ,
 
 135 S.Ct. at 2747
 
 (Scalia, J., concurring) (noting that "not once in the history of the American Republic has this Court ever suggested the death penalty is categorically impermissible," largely because "[i]t is impossible to hold unconstitutional that which the Constitution explicitly
 
 contemplates
 
 " under the Fifth Amendment). And even if relevant facts might exist to support the dissent's critique in some respects, they certainly are not in this record as no such evidence was presented here.
 
 Cf.
 

 Hidalgo
 
 , 138 S.Ct. at 1057 (Breyer, J., respecting the denial of certiorari) (agreeing with the Court's denial of review when the undeveloped record lacked relevant evidence and was "limited and largely unexamined by experts and the courts below in the first instance").
 

 ¶111 Absent a constitutional violation, the propriety of Arizona's capital scheme is strictly a matter of policy, which is outside our purview under our constitution's separation of powers.
 
 See
 
 Ariz. Const. art. 3 ("[T]he legislative, the executive, and the judicial ... departments shall be separate and distinct, and no one of such departments shall exercise the powers properly belonging to either of the others."). The dissent incorrectly suggests that we would defer to the legislature on matters of constitutional interpretation and application, abdicating our constitutional
 authority and responsibility.
 
 Infra
 
 ¶¶ 123-25. But that mischaracterizes our position and conflates constitutional issues, appropriate for judicial resolution, with purely policy choices, appropriate for the law-making role of the legislature and governor, or the people themselves.
 

 ¶112 The dissent's various criticisms of the death penalty and its alleged flaws-the time and cost involved in pursuing and administering capital punishment; its arbitrary application and disproportionate or discriminatory impact on minorities; implicit and explicit biases, including racial and geographic disparities; and lack of any measurable deterrent effect-are arguments that have been raised over the years for total abolition of capital punishment.
 
 See, e.g.
 
 ,
 
 Maloney
 
 ,
 
 105 Ariz. at 358-59
 
 ,
 
 464 P.2d at 803-04
 
 . But these are largely policy-laden factors that are proper subjects for legislative consideration, debate, and decision, not appropriate topics for judicial resolution in the absence of any evidence or argument.
 
 See, e.g.
 
 ,
 
 Endreson
 
 ,
 
 108 Ariz. at 370
 
 ,
 
 498 P.2d at 458
 
 (stating that "the question of the abolishment of the death penalty under the Arizona Constitution is a question properly left to the legislature or the people of this State through constitutional amendment");
 
 State v. Alford
 
 ,
 
 98 Ariz. 124
 
 , 132,
 
 402 P.2d 551
 
 , 559 (1965) (declining to "pass upon whether capital punishment, as a public policy, is effective" because under Arizona's separation of powers, "[w]e are limited to the judicial function of faithfully and impartially interpreting the law as enacted by the legislature").
 

 ¶113 Finally, to the extent Bush raised any issues pertaining to the constitutionality of capital punishment in general, or of Arizona's statutory scheme in particular, he did so only in summary fashion so as to avoid preclusion in federal habeas corpus proceedings. We therefore decline the invitation to revisit various un-argued claims that, as Bush acknowledges, "have previously been rejected by this Court or the federal courts." For all these reasons, although we express no opinion prospectively if the issue is raised, developed, and argued, this is not the appropriate case to address or decide the validity of capital punishment under Arizona's Constitution.
 

 CONCLUSION
 

 ¶114 We affirm Bush's convictions and sentences.
 

 CHIEF JUSTICE BALES, concurring in part.
 

 ¶115 I join ¶¶ 1-98 of the majority's opinion and ¶ 114 affirming Bush's convictions and sentences. Bush did not develop any argument that Arizona's capital sentencing scheme generally violates the Eighth Amendment's prohibition on cruel and unusual punishment or its counterpart in article 2, section 15 of the Arizona Constitution. Those issues are not before us, and I express no view on the prospective constitutional validity of Arizona's capital scheme based on properly raised arguments under the federal or state constitution.